MORA, PLAINTIFF IN ERROR, v. THE PEOPLE, DEFENDANT
IN ERROR.

1. CRIMINAL LAW—CONFESSIONS.
A confession is an admission or declaration made by a party who has
    committed a crime or misdemeanor of his agency or participation
    therein, and is generally restricted to acknowledgments of guilt.
2. SAME.
A declaration made by one accused of a crime, denying any criminal
    act and explaining suspicious circumstances for his own advantage,

is not a confession, and does not fall within the rule that confessions must be voluntary to be admissible in evidence.

3. DECLARATIONS, WHEN ADMISSIBLE.

Evidence of falsehood on the part of the accused in giving an account of himself, or of the transaction and his relation to it, is competent as affording a legitimate presumption of guilt. For this purpose the prosecution may prove such declarations, and then prove their falsity.

4. DYING DECLARATIONS.

A dying declaration is only admissible where the death of the declarant is the subject of the charge of homicide on trial, and the circumstances of the death are the subject of the declaration.

5. APPELLATE PRACTICE.

Evidence which was admitted at the trial without objection cannot be objected to for the first time in this court.

6. ERROR, WHEN CURED.

While the action of the court below in directing the jury to separate from their verdict a recommendation for mercy was objectionable in that it was misleading, the error was cured by an instruction, given while the verdict was yet under control of the jury, to the effect that the punishment for murder of the first degree was absolutely fixed by law.

7. SAME—STATUTORY CONSTRUCTION.

The week of time which is required by statute to be appointed and designated in capital cases within which the sentence must be executed, is a period of time extending from 12 midnight Saturday until 12 midnight the following Saturday, but an error in the designation of the week is rendered immaterial when the execution is stayed by this court pending review.

8. JURISDICTION OF SUPREME COURT IN CAPITAL CASES.

The court has authority to fix the date of execution in cases of affirmance, where the execution has been stayed upon writ of error or *supersedeas*.

### *Error to the District Court of Park County.*

PLAINTIFF in error was convicted of murder of the first degree, and sentenced accordingly.

He is charged in the first and second counts of the indictment with the murder of Andrew Peterson, and in the third with the murder of Nels O. Anderson, and was found guilty upon both the first and third counts.

Mr. V. G. HOLLIDAY, for plaintiff in error.    Messrs. ROBINSON & LOVE, *amici curiæ*.

Mr. EUGENE ENGLEY, attorney general, and Mr. C. A. WILKIN, for the People.

CHIEF JUSTICE HAYT delivered the opinion of the court.

It appears from the evidence that Anderson and Peterson were partners in business and warm personal friends. Their occupation was that of common laborers, and as such they had found employment in various grading, mining and other camps in this state, for several years immediately prior to their death, which occurred on or about the 9th day of July, 1891.

At the time they were passing through Park county on foot, in search of work, and were last seen by any witness produced at the trial at about nine o'clock on the morning of Thursday, July 9, 1891, at Como. Two days thereafter their dead bodies were found about seven miles from that town near the Red Hill stage road.

Peterson's body was found first. He had been killed upon the highway and his body dragged into the timber about seventy-five or one hundred yards from the road. The next day Anderson's body was found about eight or ten yards from the road. Both bodies at the time of discovery were hidden from view from the road. It was shown by expert testimony that death in each instance was produced by pistol shot wounds, which were necessarily almost immediately fatal.

The murder was for some ten days shrouded in mystery. The first clue to the perpetrators was found by a ranchman who happened to be passing. His attention was attracted to a roll of blankets in a secluded place, near the scene of the homicide. Further investigation revealed, in addition to these blankets, two pairs of overalls, a pair of trousers and some other articles. The trousers were of a peculiar pattern sometimes worn by Mexicans, but not by others. The overalls bore the evidence of having been used in sheep shearing. Further investigation led the officers to suspect the defendant Mora, and one Candido Costilla, as the perpetrators of

the crime. These men were traced to Huerfano county and the arrest of Mora effected. Costilla was killed while resisting arrest.

At the trial in the district court, the state, after proving the *corpus delicti*, introduced proof of the following, among other facts tending to show that Mora participated in the homicide. It was shown that plaintiff in error, Mora and Candido Costilla were also partners and friends; that in the month of June, 1891, they were together in the northern part of the state, shearing sheep when such work was to be had, and also gambling at odd times. Early in the month of July they left the neighborhood of the town of Byers in Arapahoe county, and started in a southerly direction. They made this trip upon horseback. A few days after starting they were seen at Castle Rock in Douglas county, and at other places at different periods within the next few days, at points between Castle Rock and Park county. Upon this trip Mora carried a silver mounted pistol with a white handle. It was a forty-one caliber. Costilla had a Colt's revolver. Although the caliber of this pistol was forty-five, either forty-four or forty-five cartridges could be used in firing it. On Thursday morning, July 9th, between the hours of ten and eleven o'clock, Mora and Costilla called at the store of Samuel Cohen in the town of Fairplay. Mora did the talking. He asked for cartridges for a forty-four or forty-five Colt's revolver. Mr. Cohen did not have either of these sizes and Mora purchased a box of forty-one caliber Colt's cartridges. The money was furnished by Costilla. He handed it to Mora and he in turn handed it to Mr. Cohen. With these cartridges the plaintiff in error, Mora, loaded his pistol before leaving the store. After this was done they both went out, got on their horses and went off. At about the same time that Mora and Costilla were at this store, Anderson and Peterson were shown to have been at the store of Mr. Pike in Como, Como being about ten miles distant from Fairplay. The witnesses for the prosecution describe in detail the dress of Anderson and Peterson at this time. Upon the person of

Anderson was a silver watch with a peculiar buckskin string about one half or three quarters of an inch wide, tied to the buttonhole.

The uncontradicted evidence of the state shows that Anderson's death was caused by a forty-one caliber bullet and Peterson's by a forty-four caliber bullet, such as was carried by Mora and Costilla, respectively; that the overalls and blankets found near the place of the killing belonged in part to Mora and in part to Costilla. In addition to this it was shown that the silver watch with the buckskin string worn by Anderson immediately prior to his death was traced into the possession of Mora shortly after the homicide, at which time he exhibited it to a ranchman living in the vicinity, for the purpose of having it set. Various articles of clothing that were identified as the property of Anderson and Peterson were shown to have been in possession of Mora and Costilla shortly after the homicide, and some blankets found in possession of Mora and Costilla were identified as those carried by Anderson and Peterson shortly prior to the homicide.

It was further shown that both Peterson and Anderson when last seen were strong, powerful men, in the very prime of life and in the full enjoyment of vigorous health. The weight of Peterson, who was the larger of the two, was estimated by witnesses for the State at from 170 to 185 pounds, and in the opinion of these witnesses, the body could not have been dragged from the road to the place where found by one person. The trail for a part of this distance was up quite a steep incline, and here the tracks of two men were distinctly visible, the tracks indicating that the men were engaged in dragging a heavy body. It was also shown that Costilla's face just before the killing was covered with a heavy growth of beard, and that he was cleanly shaven immediately thereafter, rendering identification difficult.

Mora, when seen the day after the homicide, was wearing a pair of overalls much too long and too large for him. These, or a similar pair, he had on at the time of his arrest. After arrest he was taken to Fairplay, in charge of an officer. Be-

ing obliged to change cars at Pueblo on this trip, Mora was taken off the train from the south and placed in the Pueblo jail, awaiting the west-bound train. During this interval he took off these overalls and secreted or destroyed them, leaving his person exposed so that the officer had to procure another pair to enable him to complete the journey.

When Mora was first arrested he denied knowing anything about the homicide, and that he was ever in Park county. Afterwards, from time to time, as he was confronted by evidences tending to show his participation in the crime, he undertook to explain away the unfavorable circumstances. This he did upon several occasions, the last being at the time of his preliminary examination before a justice of the peace in Park county. At this examination he was acting under the advice and direction of counsel. He went upon the witness stand voluntarily and repeated the statements which he had previously made, going into details for the purpose of explaining the incriminating circumstances brought out by the witnesses for the State.

At the trial in the district court the accused did not go upon the witness stand, but the State, as part of its case against him, was allowed to introduce, over the objections of defendant, these various statements theretofore made by him, and afterwards introduced evidence tending to prove their falsity. The objection urged to the admissibility of these statements is that they were confessions induced by some hope or promise of a benefit, and therefore not voluntary. While we think the preponderance of the evidence tends to show that these statements were freely and voluntarily made, yet their admissibility in evidence does not depend upon such fact.

An examination of these statements discloses that instead of being a confession of guilt of the crime charged, on the part of Mora, they are explanations of the incriminating circumstances brought against him, evidently intended to show his innocence of any crime. The gist of these statements is as follows :

That he was a resident of Huerfano county, Colorado, and nineteen years of age at the time of the preliminary examination; that in June, 1891, he started out with ten companions for the purpose of shearing sheep; that he had seen Costilla in Huerfano county previous to this trip but had no acquaintance with him; that afterwards they sheared sheep together in the vicinity of Byers; from Byers they went south to Douglas in El Paso county, to get work. Mora said he desired to go back home, but that Costilla prevented him from going and told him that he knew of a place where they could get work. They were at Castle Rock on the 4th of July; on the 5th at Monument; on the 6th at Woodland Park, and stayed there that night; and at Dudley's on the 7th; on the 8th slept at Chalmer's ranch, then came to Fairplay; had a forty-one caliber pistol on the trip, and Costilla had a forty-five; that he did not wish cartridges for his pistol, but that Costilla urged him to buy some; that at that time he had ascertained that Costilla was a bad man and was afraid of him; that Costilla gave him the forty-one cartridges for his (Mora's) pistol, but that he was without experience in shooting, although he had practiced some when a boy ten years of age, but never allowed himself to shoot after he was eleven years of age; that he wanted to get away from Costilla but he was compelled to stay with him.

Mora further testified in substance, as follows: " After buying the cartridges at Fairplay we camped at a ' dry camp ' about three or four miles from town. In the afternoon Costilla went away and left me at camp. I can go and point out this place. He took my revolver with him. I was alone without any revolver from three to dark. I dared not leave for fear he would kill me. Costilla brought back with him these overalls and blankets. He made me put on a pair of the overalls. I did not want to do it but was afraid of him. Afterwards Costilla went up in the mountains to a cabin and shaved off his whiskers. He had the silver plated watch with the buckskin string; it would not run and he made me take it for the purpose of having it examined and set by some one.

I had nothing to do with the killing and knew nothing about it until told by the officers in Huerfano county."

From the foregoing it will be seen that the declarations objected to are in no sense a confession. On the contrary, they are a denial of guilt and of all knowledge of the crime.

A confession is an admission or declaration made by a party who has committed a crime or misdemeanor of his agency or participation therein, and is generally restricted to acknowledgments of guilt. 1 Greenleaf on Evidence, sec. 170; Am. & Eng. Enc. of Law, vol. 3, 439; *People v. Parton*, 49 Cal. 632; *People v. Velarde*, 59 Cal. 457; *People v. LeRoy*, 65 Cal. 613; *State v. Red*, 53 Iowa, 69; *State v. Carr*, 53 Vt. 37.

Abbott in his work entitled Criminal Trial Brief, sec. 481, says, "A declaration made by one accused of a crime, denying any criminal act and explaining suspicious circumstances for his own advantage, is not a confession, and does not come within the rule that confessions must be voluntary to be admissible." Again, at sec. 513, the author says, "Evidence of falsehood on the part of the accused in giving an account of himself, or of the transaction or his relation to it, is competent as affording a legitimate presumption of guilt. For this purpose the prosecution may prove such declarations of the accused, and then prove their falsity."

It is evident that the assignment of error based upon the admission of this evidence is not well taken.

The defense offered to introduce a declaration claimed to have been made by Costilla shortly before his death. The State objected to this evidence and it was excluded by the court. The nature of the alleged statement is not disclosed. This is not material, as the evidence was not admissible for any purpose. It is *res inter alios acta*, and could not have been introduced by the State if against the accused; neither was it competent for the defendant, if it tended to exonerate him. Upon what ground it was claimed to be competent we are not advised. Presumably as a dying declaration. A dying declaration is only admissible where the death of the declarant is the subject of the charge of homicide on trial,

and the circumstances of the death are the subject of the declaration.

The next assignment of error relates to the admission of evidence to the effect that Mora refused to point out to the officers the camp at which he stayed at the time when Costilla went away, supposed to be at the time of the killing.

The evidence with reference to the refusal of Mora to go with the officers and point out the dry camp described by him, at which he alleged he sojourned during the absence of Costilla on the afternoon of the murder, seems to have been admitted, not only without objection, but at the wish of both the State and the accused. The evident purpose of the State in offering such evidence was to create the inference in the minds of the jury that such a camping place was entirely mythical. On the other hand, counsel for the accused, by showing Mora's willingness to go at any time when his counsel would accompany him, and then showing that his counsel refused to go, hoped to establish the presumption that Mora's statements were true in reference to such a camp and the occurrences detailed in connection therewith, tending to exonerate him from any connection with the murder.

Whether this matter should have been inquired into is not now for this court to determine. The defendant was defended at the trial by able counsel, who invited and encouraged this inquiry. They did not ask that it be excluded then, and cannot be heard to object to it for the first time in this court.

The next assignment brings up for review the form of the verdict and proceedings at the time of receiving the same. The first verdict returned by the jury is as follows:—" We, the jury, find the defendant guilty of murder in the first degree as charged in the first and third counts of the indictment herein. We, the jury, recommend the defendant to the mercy of the court." Upon the attention of the court being called to the recommendation to mercy, the jury were directed to separate the finding and the recommendation. Thereupon the jury retired to their room and thereafter re-

turned to the court a verdict in accordance with the court's instructions. Thereupon counsel for defendant asked that the jury be polled, and that they be first instructed by the court that no discretion existed in the court in regard to the penalty or sentence to be pronounced upon the verdict as it then read; the penalty being absolutely fixed by law. Thereupon the court instructed the jury in writing as follows :— " The penalty for murder of the first degree is absolutely fixed by the statute and cannot be varied or changed by the court." After this instruction had been given, the jury was polled at the request of defendant's counsel, and each juror answered that the verdict returned was and is his verdict.

In cases of this character in this state, jurors have nothing whatever to do with fixing the punishment. In this instance the punishment for the offense is fixed absolutely by the statute and it was only for the jury to ascertain under the evidence whether or not defendant was guilty of the crime charged. *The record discloses that the verdict of guilty was found before anything was said by the court with reference to the penalty.* The action of the court in directing the jury to separate from their verdict the recommendation for mercy was objectionable in that it was misleading, but this objection was afterwards cured by the instruction given to the effect that the punishment was absolutely fixed by law for murder of the first degree. This was given while the verdict was yet under the control of the jury; subsequently the jury were polled, and with this information each returned an affirmative answer to the question " was this and is this now your verdict? "

The court in fixing the week for the execution overlooked the fact that a calendar week should have been designated, *i. e.*, a period of time extending from 12 o'clock midnight Saturday until 12 o'clock midnight the following Saturday. *In re Tyson*, 13 Colo. 482. The defendant was reprieved by the governor before the week designated commenced to run, and the execution was thereafter stayed by this court

pending this review, consequently the date fixed by the trial court is no longer material.

In this state there is direct statutory authority given this court to fix the date of execution in case of affirmance where the execution has been stayed upon a writ of error or *supersedeas*. It is now urged that, as the judgment of the district court cannot be affirmed as to the time of execution, the prisoner must be discharged or remanded for a new trial.

This would be to render the statute meaningless. In no case does this court affirm the sentence as to the time of execution, as such time necessarily elapses before the case reaches a determination in this court. To give this statute any force or effect whatever, we must uphold the power of this court to now fix the week for the execution. Moreover, there is authority in support of this right in the absence of any statute expressly conferring the power. Wharton's Crim. Pl. & Pr., 9th ed., sec. 927 ; *Daniels v. Commonwealth,* 7 Pa. St. 371; *Beale v. Commonwealth,* 25 Pa. St. 11.

The argument based upon the youth of the prisoner at the time of the murder, and the power and influence wielded over him by his older companion, may properly be addressed to the executive. It can have no weight upon this review. The trial appears to have been fairly conducted in the court below. The prisoner was defended by able counsel. He was found guilty by an impartial jury, and no reason appears why this court should interfere to prevent the sentence of the law from being inflicted in his case. An order will therefore be entered of record designating the calendar week commencing January 7, 1894, as the week for carrying the judgment of the district court into effect.

*Affirmed.*