No. 15,479.

BRUNER *v.* THE PEOPLE.
(156 P. [2d] 111)

Decided January 22, 1945.   Rehearing denied February 19, 1945.

Mr. FRED A. VIDEON, Mr. ROBERT H. LAGRANGE, Mr. CALVIN W. RAWLINGS, Mr. PARNELL BLACK, for plaintiff in error.

Mr. GAIL L. IRELAND, Attorney General, Mr. H. LAWRENCE HINKLEY, Deputy, Mr. JAMES S. HENDERSON, Assistant, for the people.

*En Banc.*

MR. JUSTICE ALTER delivered the opinion of the court.

PLAINTIFF in error, hereinafter called defendant, was on August 25, 1943, charged with murder in the first degree. Upon the trial he was convicted of murder in the second degree and sentenced to a term in the penitentiary. To review the judgment he prosecutes this writ of error.

The thirty-five assignments of error may, for our purposes, be classified: 1. Admission of defendant's statement of August 22, 1943. 2. Proof of the corpus delicti. 3. Admission of defendant's statement of September 20, 1943. 4. The giving and refusing of instructions.

The evidence in this case is rather voluminous, but a detailed statement is deemed necessary for proper understanding.

The record disclosed that in July, 1941, and for some time prior thereto, defendant was employed by the Denver and Salt Lake Railroad Company at Phippsburg, Colorado, where he resided with his wife and two children. Some time prior to July, 1941, Mrs. Bruner had commenced an action for divorce, but had subsequently dismissed it, and the marital relationship was ostensibly resumed. While the divorce action was pending between defendant and his wife he entered into

written obligations to make certain payments to his wife in event a divorce was granted, and these obligations were in evidence.

Discord between the defendant and his wife again arose because of defendant's conduct with other women. It had developed to such an extent that defendant was desirous of a divorce, but was apparently dissuaded because of his apprehension that the alimony payments might be too burdensome.

On the morning of July 5, 1941, Rose Bruner, the wife of defendant, had visited her mother, Mrs. Frazier, who lived nearby, and had agreed to purchase meat for her mother's Sunday dinner. Subsequently, and about 4 o'clock in the afternoon of that day, defendant, his wife and children, drove by Rose's mother's house and advised that the meat had been purchased and that it would be delivered next morning after Rose's children had gone to Sunday school. This is the last time Rose's mother ever saw her.

On Sunday morning, July 6, 1941, at about 7 o'clock, defendant saw Rose's mother and stated to her that Rose had taken the children and gone to Grand Junction, when, as a matter of fact, the children had been taken by defendant to the home of his amoret at Oak Creek early that morning, as we shall presently detail. The mother expressed some alarm at defendant's statement as to Rose's whereabouts because she had always been Rose's confidante, and, consequently, Rose's departure without any intimation thereof came as a surprise.

After this statement by defendant as to Rose's whereabouts, the mother did not see defendant again until about 8 or 9 o'clock on the evening of July 8, 1941, when she came to defendant's home and was welcomed by the two children. Defendant, upon being asked where Rose was, stated that she was not there and she had gone to Grand Junction with her friends, Leslie and Mildred, and stated that he did not know whether she intended to return. The two children were taken to

Rose's mother's home and remained with her during the night.

In the early morning hours of July 9, 1941, Rose's mother went to the defendant's house on at least three occasions and failed to arouse anyone. She discovered a padlock on the garage door, which was the first time this had ever been brought to her attention although she had frequently seen the garage. During the afternoon of July 9, 1941, the defendant called Mrs. Gray, at Cascade Locks, Oregon, who was a sister of Rose and had visited the defendant and his wife the previous June, and in his telephonic conversation with Mrs. Gray stated that Rose had gone to Grand Junction and had left the two children with her mother. He told her, "She walked out on the kids and me." He then requested Mrs. Gray as follows: "I want you to send a wire to your mother that she is with you—for her good I want you to send the wire." Upon inquiry by Mrs. Gray as to the trouble between defendant and Rose, no response was obtained, but defendant did say, "Now, when she gets to your house I want you to try to talk some sense into her and get her back to me." Mrs. Gray promised to but did not send the wire as requested. During the afternoon of July 9, 1941, Mrs. Frazier went into defendant's home to find her daughter's personal belongings, and practically nothing was missing. She did find her daughter's wedding ring on the dresser, and this excited her suspicion because Rose had stated to her on occasions that the wedding ring had never been off her finger since her wedding. This wedding ring was taken by Rose's mother and given to Rose's father, and produced as an exhibit at the trial.

While Mrs. Frazier was in defendant's house looking through Rose's possessions there remaining, defendant asked her if she had seen or found forty-five dollars which he said belonged to Rose, to which he received a negative reply. Rose's money was subsequently found, secreted between two mattresses in the house, in an en-

velope marked "Rose Bruner," and the envelope was introduced in evidence.

Mrs. Frazier's anxiety because of Rose's mysterious disappearance prompted the defendant to state that he planned to contact the Bureau of Missing Persons in Salt Lake City and solicit its assistance in locating her. At this time he stated that he had had some difficulty with Rose on the night of July 5, 1941, when he told her that he proposed to go to Salt Lake City, and she insisted that she and her children should accompany him, but to this he refused to consent.

On July 10, 1941, no telegram had been received by Mrs. Frazier containing such a message as defendant had suggested Mrs. Gray send. He thereupon sent a telegram reading, "They have not received a message from you yet." to which telegram Mrs. Gray sent an answer to the effect that she could not do as requested, but desired information sent her. On July 12, 1941, defendant again wired Mrs. Gray, stating that Rose had passed through Salt Lake City on her way to Cascade Locks, Oregon, and requested an immediate answer because he stated "Mother frantic."

Searching parties were arranged and bloodhounds were used, but nothing was learned of Rose's whereabouts.

Marie Garcia was the young lady with whom the defendant was presently enamored, and her deposition was taken, and, without objection, read to the jury. In her deposition she testified that the defendant was in the restaurant where she was employed on the evening of July 5, 1941, and took her home on that occasion. In a conversation on the way home he invited her and her folk to accompany him to Salt Lake City, stating that he would call for her that night about 9:30. Defendant did not return for her at 9:30, but appeared the next morning at about 6 o'clock with his two children, and, without any explanation as to why he had not kept his appointment for the previous evening, asked her to

keep, feed and attend to his two children while he went back to Phippsburg and got some clothing for them. He did not return from his trip to Phippsburg until about 9 or 10 o'clock, and the contemplated trip to Salt Lake City was not undertaken until about 10 o'clock that morning. In the party going to Salt Lake City were the defendant, the witness, defendant's two children, and some relatives of the witness. On the way to Salt Lake City defendant stated that he was going to leave his two children in Salt Lake City with his brother, but, as we have already stated, the children returned to Phippsburg with the defendant.

On the morning of July 6, 1941, when defendant left his children in the care of Marie Garcia, he inquired for a hasp, and upon being advised that one was attached to a part of a building, removed the hasp, stating that he wanted it for the purpose locking his garage. A hasp and lock were seen for the first time on defendant's garage on July 6, 1941, or very shortly thereafter.

On November 12, 1941, defendant began an action in the courts of Wyoming, in which he sought a decree of divorce from his wife, Rose, and in the verified complaint alleged that he had been a resident of the state of Wyoming at least sixty days prior to the commencement of the action. The action of divorce in some manner coming to the attention of Rose's father, he swore to a complaint in the courts of Wyoming, in which he charged that defendant had committed perjury in falsely swearing to his residence in Wyoming. Upon this perjury charge defendant was arrested at his then residence in California and returned to Wyoming where he was incarcerated in the county jail at Rawlins.

On December 21, 1941, defendant remarried, although a hearing upon his divorce action did not occur prior to February 17, 1942. When defendant was returned from California to Rawlins, Wyoming, his wife and two children followed him and were in Rawlins, Wyoming, and were permitted to visit him.

While the defendant was incarcerated in Rawlins, Wyoming, Mr. Todd, the sheriff of Routt county, Colorado, requested him to waive extradition and consent to be taken to Colorado Springs, Colorado, for the purpose of having the chief of police of Colorado Springs interrogate him with reference to the disappearance of Rose. While defendant's consent was reluctant, it was nevertheless given, and on August 11, 1943, defendant was taken to Colorado Springs and incarcerated in the county jail there. The chief of police and a Mr. Grant had defendant brought from the county jail to the city jail, where he was interrogated for periods of two hours or so daily in the forenoon, afternoon, and evening, from August 17, 1943, to August 23, 1943. While in Colorado Springs no person other than the chief of police or Mr. Grant was permitted to see the defendant although defendant testified that he frequently requested permission to contact his attorneys and to communicate with his wife.

In December, 1941, defendant, while employed by a railroad company, was involved in an accident which resulted in the loss of a leg, and at the time of his arrest the judgment secured by defendant against the railroad company was before the supreme court of Utah. The claim agent for the railroad company unduly interested himself in causing the arrest and interrogation of defendant, the reason for which is not disclosed.

We shall now consider the signed statement which was obtained from the defendant by the chief of police and Mr. Grant at Colorado Springs, Colorado, in August, 1943, to the admission in evidence of which defendant complains.

The statement was taken in the form of questions and answers, each page initialed by the defendant, and was signed by him.

The district attorney, in his opening statement to the jury, made some reference to this written statement and also to a statement subsequently obtained, and

upon objection to any reference to the statements, the court, out of the presence of the jury, properly entered into a full hearing to ascertain whether or not the statements were obtained voluntarily and were admissible in evidence. At the conclusion of the hearing the court determined that the statement of August 22, 1943, and the statement of September 20, 1943, were voluntary and therefore admissible. Upon the trial proper objections to the introduction of this testimony were made and the circumstances under which the evidence was obtained were fully disclosed to the jury. The statement made on September 20, 1943, was not reduced to writing.

It is defendant's contention that the statement made by him on August 22, 1943, was involuntary, was obtained by force, intimidation, and inhuman treatment, and that, therefore, under these circumstances, its admission in evidence constituted prejudicial error. It therefore becomes necessary for us to determine whether the trial court abused its discretion in the admission of this evidence, and for that purpose we deem it necessary to review the evidence concerning defendant's arrest, incarceration, and the methods used in obtaining the statements, and this we shall do by first considering the statement of August 22, 1943.

1. It appears that defendant was arrested in California on July 27, 1943, on a warrant charging perjury committed in Wyoming. He was brought to Wyoming by the officers, arriving in Rawlins, Wyoming, on August 3, 1943. He was kept in the county jail in Wyoming until the afternoon of August 10, 1943, and while kept there was not held incommunicado. He signed a written waiver and consent to be taken to Colorado Springs for the purpose of there being interrogated concerning the disappearance of his wife in July, 1941, and was incarcerated in the county jail at Colorado Springs on August 11, 1943, where he was held incommunicado until August 17, 1943, when he was first

taken before Mr. Bruce, the chief of police of Colorado Springs. He was questioned daily thereafter until about August 22, 1943, the questioning being for periods of one and a half or two hours each morning, afternoon, and evening. Just prior to August 22, 1943, and after the repeated interrogations by Mr. Bruce and sometimes by a Mr. Grant, defendant made the statement referred to as the August 22, 1943, statement. During the interrogations it appears that Mr. Bruce or Mr. Grant frequently told defendant that his answers to their questions were untrue and that he was a liar and other inappropriate and opprobious language was used. Although he states that he requested the privilege of communicating with his attorneys and his wife, this request was denied.

In the statement of August 22, 1943, defendant declared that there was an estrangement between him and his wife, and on the evening of July 5, 1941, at about 9 or 10 o'clock, as he and his wife were retiring, he informed her that he contemplated a trip to Salt Lake City and was going to take with him their two children, but that she might not go. This statement culminated in a bitter argument, and at about midnight defendant and his wife arose from bed and both began dressing, the defendant on one side of the bed and his wife on the other. His wife reached across the bed and grasped him by his clothing and attempted to pull him back on the bed, when his clothing gave way, and she fell off the bed, striking her head on some article of furniture. Defendant then stated that he attempted to revive his wife, who was unconscious, and after being unsuccessful and finding her apparently dead, he became panic-stricken, believing that because of the known domestic discord he would be accused of having murdered his wife. After satisfying himself that she was dead, he put her body in a blanket, trussed her limbs against her body, and carried the body out to the garage. He thereupon returned to the bedroom and

attempted to destroy blood marks on the floor and furniture, burned some of the bedding, as well as some of her clothing, upon which blood marks existed, and then contemplated what next should be done to relieve suspicion as to his wife's death.

On the evening of July 5, 1941, and prior to the quarrel, he had arranged with one Marie Garcia, a waitress in a restaurant at Oak Creek, to go with him on his contemplated trip to Salt Lake City and had arranged with her to leave that night. The wife's death necessitated a change in this plan, and on the early morning of July 6, 1941, he awakened his two children and took them in his automobile to Marie Garcia's residence in Oak Creek, asked her to feed and care for them, stating that he would return very shortly. In the course of this conversation with Marie Garcia he inquired about a hasp, stating that he wanted to put it on his garage, and upon being told that there was one attached to some part of the house, removed the hasp and then departed for his home in Phippsburg. When he returned to Phippsburg in the early morning of July 6, 1941, he went to the railroad roundhouse, bathed and shaved, and secured a lock. He then placed the hasp upon the garage door and locked the door. He advised Rose's mother, upon her inquiry, that Rose had taken the two children and had gone to Grand Junction with two or her friends.

He and Marie Garcia and other members of her family and his two children left Oak Creek for Salt Lake City in the forenoon of July 6, 1941, and remained in Salt Lake City until the afternoon of July 8, 1941, when he returned to Phippsburg.

He admits the telephone and telegraph messages to Rose's sister, to which we have heretofore referred.

On the night of July 8, 1941, he placed the body of his wife in the trunk of his car and drove to a bridge across the river below Fruita, Colorado, and threw the body in the river. The reason he assigns for selecting

this particular spot in the river was because of the disappearance of a body at that particular place some time before.

He states that he had been treated all right by the officers and there had been no abuse or force used in obtaining the statement, but makes some reference to a promise of the officers that the perjury charge in Wyoming and some charge with reference to the sale of mortgaged property pending in Colorado, would be dismissed, and some reference to a promise of assistance by the officers in securing a change of venue to El Paso county if a charge growing out of the disappearance of his wife should be filed. In the statement he admits that he understood that the only one who could grant a change of venue was the district judge in Routt county. This in a general way covers the entire statement of August 22, 1943.

If the statement of August 22, 1943, was a confession, its voluntariness must be inquired into preliminarily by the judge out of the presence of the jury before its admission, and the court's determination may be reversible error if, upon review of the evidence, it is finally concluded that there was an abuse of discretion. However, if the statement is not a confession, the question as to its voluntarity is unimportant.

It therefore becomes necessary to determine from the statement of August 22, 1943, whether it is a confession. "A confession is *an acknowledgment in express words, by the accused in a criminal case, of the truth of the guilty fact charged or of some essential part of it.*" 3 Wigmore on Evidence (3d ed.), p. 238, §821. "A confession is defined as an acknowledgment of guilt of the crime charged or of the facts which constitute the crime; but it is an admission and not a confession if the facts acknowledged raise an inference of guilt only when considered with other facts." Underhill's Criminal Evidence (4th ed.), p. 507, §265.

The charge in the information was murder, and there

is no statement made by defendant on August 22, 1943, that in any wise admits that he was responsible for the death of his wife. As a matter of fact, if the statement of August 22, 1943, each page of which defendant initialed and which was signed by him, is truthful, it completely exculpates and exonerates him.

██ Under the circumstances, where a statement exonerates and exculpates one accused of crime, its voluntariness need not be established.

· "A confession is an admission or declaration made by a party who has committed a crime or misdemeanor of his agency or participation therein, and is generally restricted to acknowledgments of guilt (citing cases).

"Abbott in his work entitled Criminal Trial Brief, sec. 481, says, 'A declaration made by one accused of a crime, denying any criminal act and explaining suspicious circumstances for his own advantage, is not a confession, and does not come within the rule that confessions must be voluntary to be admissible.' Again, at sec. 513, the author says, 'Evidence of falsehood on the part of the accused in giving an account of himself, or of the transaction or his relation to it, is competent as affording a legitimate presumption of guilt. For this purpose the prosecution may prove such declarations of the accused, and then prove their falsity.'" *Mora v. People,* 19 Colo. 255, 262, 35 Pac. 179.

██ Our examination justifies the conclusion that the distinction between a confession and an admission, as pointed out in *Mora v. People, supra,* is sound, and finds support in the great majority of jurisdictions. 8 Words and Phrases (Permanent ed.), p. 525, et seq. The statement being favorable to defendant, it matters not how it was obtained for it was exculpating rather than inculpating and therefore could not prejudice him. Consequently, we are constrained to hold that the court did not err in admitting Exhibit A, being the defendant's statement of August 22, 1943, in evidence.

■ 2. It is well settled in this jurisdiction that the corpus delicti consists of two components: death as a result, and the criminal agency of another as the means, and it is equally settled that the corpus delicti may be established by either direct or circumstantial evidence. *Roberts v. People,* 11 Colo. 213, 17 Pac. 637; *Ausmus and Moon v. People,* 47 Colo. 167, 107 Pac. 204; *Bunch v. People,* 87 Colo. 84, 285 Pac. 766.

"To convict one of crime, proof must be made that the offense was committed and also that the accused was the perpetrator or one of the perpetrators of the offence, and both may be shown by circumstantial evidence. * * *" Underhill's Criminal Evidence (4th ed.), p. 41, §35.

"The corpus delicti, and all the elements thereof, may be proved by circumstantial evidence, from which the jury may reasonably infer that a crime has been committed. Such evidence must exclude every reasonable hypothesis except guilt, and be convincing to a moral certainty; and such proof of corpus delicti must be the most convincing and satisfactory proof compatible with the nature of the case." Underhill's Criminal Evidence (4th ed.), p. 45, §37.

"A large number of the more modern cases, probably constituting the weight of authority, however, have adopted the rule that all of the elements of the *corpus delicti,* including the fact of the death of the person alleged to have been murdered, as well as the criminal agency of the accused, and the identity of the deceased, may be proved by presumptive or cimcumstantial evidence, at least when direct evidence is not available. And in case of the entire destruction or disappearance of the body of the person alleged to have been killed, as in the case of drowning at sea, the *corpus delicti* may be proved circumstantially or inferentially. * * *" Wharton on Homicide (3d ed.), pp. 898, 899, §588.

"It seems now pretty generally held that circumstantial evidence is admissible to establish the *corpus*

*delicti* in a trial for murder, but that it must be strong and cogent. * * *" 1 Wharton's Criminal Law (12th ed.), p. 458, §353.

██ "In a case where circumstantial evidence is relied upon to establish the *corpus delicti*, it is not sufficient that the circumstances proved coincide with and account for, and therefore render probable, the hypothesis of the guilt of the accused. The evidence must be such as to establish the *corpus delicti* to a reasonable certainty, and exclude every other possible hypothesis except that of guilt; that is, the evidence must be such as to establish so positively the *corpus delicti* as to exclude from the minds of the jury all uncertainty in regard to it. But to do this it is not necessary that each particular circumstance be established thus conclusively. It is sufficient if the combined effect of all the circumstances proved in a case is such as to produce the same degree of certainty in regard to the *corpus delicti* as would be established by direct and positive proof." 1 Wharton's Criminal Law (12th ed.), p. 461, §355.

Considering the statement made by defendant on August 22, 1943, with reference to the disappearance of Rose and his connection therewith; considering his deliberate falsehoods and futile attempts to allay any suspicion connecting him with Rose's disappearance; considering his confessed inhuman and almost unbelievable disposition of the body of his wife and the mother of his children; considering all his efforts in burning evidence of guilt found in the bedroom where he says Rose's death occurred; considering his efforts to further allay any suspicion which might be directed toward him by commencing a divorce action in Wyoming in November, 1941, which did not ripen into a divorce until February, 1942, notwithstanding which fact he remarried on December 21, 1941; considering all the other facts and circumstances which so definitely and conclusively point out Rose's death, we have no hesitancy in determining that there was sufficient com-

petent circumstantial or presumptive evidence before the jury from which it might determine that the corpus delicti had been conclusively established by strong and cogent evidence.

3. The defendant was questioned by the chief of police and a Mr. Grant in Colorado Springs from September 6, 1943, to September 10, 1943, inclusive, without obtaining any new admission.

On or about Labor Day Mr. Bruce states that he discussed with the defendant the use of a lie detector, which statement is denied by defendant. However that may be, pursuant to arrangements made, one Schrieber, of Chicago, who was an expert in the use of the lie detector, reported to Sheriff Todd the date of his arrival in Colorado Springs. This information was transmitted to Mr. Bruce, who met Mr. Schrieber at the depot at about 8 o'clock on the morning of September 19, 1943. Mr. Bruce states that Mr. Schrieber started his examination of the defendant at about 1:30 in the afternoon of September 19, 1943, and that the examination continued from that time until 3:30 o'clock in the morning of September 20, 1943. Mr. Schrieber was not called as a witness. Defendant and Mr. Schrieber were alone from about noon on September 19, 1943, until the early morning hours of September 20, 1943, and as to the occurrences and treatment accorded defendant during this period, no one other than defendant testified.

■■ With reference to the statement of September 20, 1943, defendant testified that he had never been requested to, nor had he consented to undergo an examination by a lie detector. The question of a lie detector came to his attention first on the morning of Septmeber 19, 1943.

Defendant, a little before noon on September 19, 1943, was taken from the county jail in Colorado Springs to the city jail and immediately taken into Mr. Bruce's office, where he was introduced to Mr. Schrieber. After

the introduction he was taken by Mr. Schrieber to the front office in the city jail, which is described as a room about fourteen by eighteen feet in size, with two desks in it and several chairs and a washbasin, and he was placed in an ordinary straight backed, hard bottomed chair. At this time he was using his crutches. Mr. Schrieber explained the use of the lie detector and told defendant that he wanted him to make a statement, which defendant refused to make. The lie detector was attached to defendant's body, and, while Schrieber left the room occasionally, defendant remained in there. While the machine was attached to defendant's body he persisted in his refusal to answer questions, notwithstanding which the machine was left on continuously until after midnight except for one period when defendant removed it because his whole arm became bloodshot, and he was very uncomfortable. During the time the machine was attached to defendant he was questioned as to whether he had shot or knifed or bludgeoned or choked his wife.

While he was being interrogated by Schrieber and while undergoing the examination with the lie detector, he was not permitted to leave the chair on which he was seated and was not permitted to go to the toilet until some time after midnight, although he had previously requested permission to do so. Defendant was advised that he would continue to undergo this treatment until a favorable statement was obtained. Defendant had had nothing to eat from breakfast time on September 19, 1943, until after 3:30 o'clock A.M. on September 20, 1943, and states that he was physically exhausted.

During the course of the examination he was accused of being heartless and low-down and lower than a snake, and was referred to as a son-of-a-bitch, and Mr. Schrieber told him that a little Chicago treatment would do him more good than anything else. In connection with the Chicago treatment, defendant was told "* * *

that back there they hang them where their feet are about a foot over the door; hang over a door with handcuffs on and beat them within an inch of their life." So far as the testimony reveals, the "Chicago treatment" was not used.

Some time after midnight Mr. Schrieber left the room and returned with Mr. Bruce, this being the first time Mr. Bruce had come into the room that night, and in Mr. Bruce's presence the questioning of defendant continued, and after Mr. Bruce had questioned defendant he went out and Mr. Todd, the sheriff, came in at about 2:30 o'clock in the morning. Defendant requested Sheriff Todd to get him some food and let him get some sleep, to which Sheriff Todd replied in substance that he was not going to be given any food or sleep until the whole matter had been finally cleared up. Sheriff Todd suggested that he desired defendant to admit that he choked his wife in an effort to scare her, and defendant then replied, *"I never did anything of that kind just to scare her.  I never laid a hand on that woman in my life."*

When defendant persisted in his refusal to admit culpability in connection with his wife's death in accordance with Sheriff Todd's suggestion, the sheriff left the room and presently returned with Mr. Schrieber and Chief of Police Bruce, and immediately defendant was asked by Chief of Police Bruce if he had told the sheriff that he had choked his wife, to which defendant answered "No," and then the sheriff stated, "He told me he was going to scare his wife and held on too long and just chocked her that long," to which defendant replied, "I never laid a hand on that woman in my life."

During all of the examination defendant states that he never said in words or in substance to Sheriff Todd or Mr. Bruce or Mr. Schrieber that he had ever choked his wife.

The court admitted the testimony of police officers

with reference to statements which it is alleged defendant made after the polygraph experience testified to by defendant, which, it should be remembered, was practically continuous from about noon on September 19, 1943, until about 3:30 o'clock on September 20, 1943. The police officers testified that at about 3:30 o'clock on the morning of September 20, 1943, Bruner stated that on the evening of July 5, 1941, he and his wife had a most violent quarrel and that he strangled his wife to death, and after leaving her for about an hour and finding no evidence of life, he wrapped her in a blanket, trussed up her knees to her chest, so that she would fit in his automobile, and placed the body in the garage. According to the testimony of the police officers, he awakened his two children and took them to Marie Garcia's house, requesting her to feed and clean them and prepare for a trip to Salt Lake City. While at Marie's home he secured the hasp, and returning to Phippsburg, shaved and bathed at the roundhouse, and stole a lock with which to lock his garage door, and then returning to Marie's house, took the trip to Salt Lake City as related in his statement of August 22, 1943. Upon returning to Phippsburg on July 8 or 9, 1941, he placed the body in his car, drove down to the Fruita bridge, a distance of over one hundred miles, and there threw his wife's body in the river. According to the officers his statement was that he burned most of his wife's clothing, removed her wedding ring and placed it upon the dresser, where it was subsequently found by his wife's mother.

We are called upon to determine whether or not this confession of defendant on September 20, 1943, obtained as testified by him, was voluntary. It should be remembered that the only person testifying to the occurrences from about noon on September 19, 1943, to the morning of September 20, 1943, was the defendant, and in no substantial detail is there any contradiction. If the confession of September 20, 1943, was voluntary, and

consequently admissible, he is clearly guilty of murder. If involuntary, even though the statements made thereat were actually made by defendant and are true, it is our duty to reverse the judgment and remand this case for further proceedings in accordance with our mandate. The admissibility of this statement is wholly dependent upon its voluntarity. The citation of authorities is unnecessary.

We understand and fully appreciate the handicaps which police officers ofttimes find in the solution of crimes and we generally commend them for their efforts in law enforcement. Here we have a man accused of murder who is arrested in California on July 27, 1943, on a perjury charge. He is taken in custody by the police officers and brought back to Rawlins, Wyoming, where he is incarcerated in the county jail for a period of five or six days, and under some persuasion, finally consents to be removed to Colorado Springs for the purpose of being interrogated by one of our best known police officers respecting the disappearance of defendant's wife on July 5, 1941. No warrant is filed charging him with the commission of any offense against his wife, notwithstanding which he is held incommunicado in the county jail from August 11, 1943, until the fore part of September, 1943. He is constantly interrogated morning, afternoon, and night by police officers and is accused of the murder of his wife. He finally made a statement on August 22, 1943, which earned him a surcease from further questioning until September 6, 1943. On September 6, 1943, this questioning by the police officers was resumed and continued morning, afternoon, and night until September 10, 1943, when defendant was removed to Steamboat Springs, the county seat of the county in which the alleged murder was alleged to have occurred, where he remained until September 18, 1943, undergoing further questioning. Without notice and without court order, the sheriff removed defendant from Steamboat Springs

to Colorado Springs on September 18, 1943, where he was lodged in the county jail.

On the morning of September 19, 1943, or about noon on that day, defendant was taken from the county jail to the police station in Colorado Springs and there introduced to Mr. Schrieber. Immediately thereafter he was taken into a room, seated on a straight backed, hard bottomed chair, where he remained until 3:30 o'clock next morning. During all of the time and until 2:30 o'clock he was in the exclusive custody and under the complete control of Mr. Schrieber, who was using the polygraph almost continuously for the purpose of wresting a confession from defendant. During the fifteen-hour session defendant was given neither food nor rest, nor an opportunity to answer the call of nature. According to defendant's testimony, which is uncontradicted, Schrieber advised him several times that the inquisition would continue until defendant gave him what he was after. During the inquisition Schrieber accused the defendant of murdering his wife, called him a low-down son-of-a-bitch, and other opprobrious epithets and at least suggested that the Chicago treatment would probably bring about a confession.

We are mindful of the fact that the circumstances and conditions surrounding the defendant when, according to the police officers' testimony, he made his confession of September 20, 1943, were in evidence before the trial court, and we are also mindful of the fact that the trial court's determination of the voluntariness of a confession should be adhered to by this court unless there is a clear abuse of discretion. *Moya v. People,* 88 Colo. 139, 293 Pac. 335; *Moss v. People,* 92 Colo. 88, 18 P. (2d) 316; *Saiz v. People,* 93 Colo. 291, 25 P. (2d) 1114.

Having in mind the frequent, lengthy, and continuous interrogation that this defendant was obliged to undergo between August 17, 1943, and August 23, 1943; the persistence of the police officers in their interroga-

tions from September 6, 1943, to September 10, 1943, while defendant was still incarcerated in the county jail or city jail at Colorado Springs, and remembering the continuance of these interrogations by police officers in the county jail at Steamboat Springs on September 11, 1943, to September 18, 1943, we can readily understand why the defendant should have concluded in the early hours of September 20, 1943, that the only method he could adopt to secure for himself food and rest and the ordinary comforts that humans enjoy was to inculpate himself in the murder of his wife just as the police officers wanted him to do. It is true that the defendant emphatically denies that he made any confession on September 20, 1943; it is equally true that the officers emphatically state that the defendant made a confession. We are not at all concerned in determining the truth or falsity of defendant's statement that no confession was made; we are concerned in determining whether, if the confession was made, as the officers testify, its admission in evidence was proper. Under the facts and circumstances of this case as appears from the uncontradicted evidence, we hold that the confession, if made, was obtained as a result of inhuman treatment and therefore involuntary. Continued and persistent questioning and accusations to the point of exhaustion of a defendant may be just as effectual in obtaining a confession as threats, promises or physical abuse. This defendant was justified in assuming that Schrieber's treatment would continue until such time as defendant was physically and mentally exhausted, and in this condition make a confession of guilt. We find that the confession of September 20, 1943, if made, was not a voluntary one, and that in holding it was such, the trial court abused its discretion and committed reversible error.

In event of a new trial, nothing herein forcasts our conclusion if additional evidence as to the voluntariness of the alleged confession is introduced, and nothing

herein precludes the introduction of such evidence. We are guided solely by the evidence contained in the record now before us.

■ ■ 4. An examination of the record discloses that the court gave an instruction with reference to the so-called confession of September 20, 1943, to which defendant objected and excepted because it limited the jury's function in connection therewith to determining the weight and creditability to be given it. The instruction is:

"In considering the weight, if any, which you shall give to the alleged statements or confessions in this case, you may consider the question of whether or not, under the evidence, it appears that any statement or confession was made by the defendant under or by reason of any promise or hope held out to him that he would fare better or receive any less punishment by reason of such statement or confession; you may also consider the question whether or not, under the evidence, it appears that any statement or confession was made by the defendant under any threat or intimidation, provided you find that such statement or confession, if made, was made by the defendant as the result of such promise, inducement, threat or intimidation; and you may consider all other facts and circumstances surrounding the making of such statement or confession.

"The question of whether the defendant was warned by the officer or officers that any statement or confession he might make might be used against him in the trial of this case is only important as to the weight which you may give to such alleged statement or confession."

Defendant tendered an instruction reading as follows: "You are instructed that extrajudicial statements or confessions of one on trial for the commission of a crime must be voluntary, otherwise they are not admissible against him, and that the burden is upon the people to

prove that any extrajudicial statements or confessions offered in evidence by them are voluntary; therefore, if you shall find and believe from all the evidence in this case that the extrajudicial statements or confessions alleged to have been made by the defendant were not voluntary then you shall disregard such statements or confessions *entirely,* you are further instructed that if you shall find and believe from the evidence or the lack of evidence in the case that the statements or confessions alleged to have been made by the defendant were not voluntary then you should return a verdict of not guilty" (Italics ours), which is a correct statement of the law down to and including the word "entirely" which we have italicized. The remainder of the instruction should not have been given, but inasmuch as the defendant tendered and requested an instruction on the weight to be given the so-called confession, under the circumstances it was obligatory upon the court to instruct the jury on this phase of the defendant's case.

We recognize as a correct principle of law that the judge must preliminarily determine whether a confession is free and voluntary, and having determined that it is, the confession is then admissible in evidence; however, the determination of this question by the judge is, as we have said, preliminary, and there yet remains a function to be exercised by the jury concerning it. The jury is charged with the duty of determining in the last and final analysis whether the confession is freely and voluntarily made, and if the jury determines that it is not freely and voluntarily made, it is proper to disregard all testimony relative to the confession.

The ruling of the judge on the voluntariness of the confession is not at all binding or conclusive on the jury and it may properly disregard the view taken by the judge, and, as the trier of all questions of fact, conclude that the confession was not free and voluntary, and having reached this conclusion from the evidence, it is the jury's duty to entirely disregard it.

218

This is generally held to be the law. Where the evidence is conflicting as to the voluntariness of a confession it is almost universally held that it is necessary and proper that the court instruct the jury that if they do not believe that the confession was made freely and voluntarily they must wholly disregard it in arriving at their verdict. 23 C.J.S., p. 797, §1232, and cases therein cited.

The court erred in giving the quoted instruction and in refusing to properly instruct the jury upon its duty if, from the evidence, it reached the conclusion that the confession was not freely and voluntarily made.

While the majority of the justices are of the opinion that since the question of limitation of cross-examination of defendant is not raised by assignment of cross error or argued by the parties, it should not be noticed, nevertheless the writer and those who agree with him are of the opinion that it should be. The writer and those justices agreeing with him are of the opinion that the prosecuting attorney was unduly limited in his cross-examination of the defendant when he appeared as a witness before the jury.

The charge in this case was murder and one of the purposes of the trial was to learn who was criminally responsible. When the defendant elected to take the witness stand before the jury in his own behalf, he waived his constitutional privilege against self incrimination; he could be cross-examined as to any and all relevant and material facts in issue. He had no right, as a witness, to bring to the jury's attention facts which tend to exculpate him without laying himself liable to a cross-examination upon those facts and any other facts which are pertinent to the determination of the real issue in the case. He took the witness stand of his own volition, and he then accorded the district attorney the right to examine him fully and in detail as to any fact in connection with the case, the existence of which rendered probable or improbable the main fact

sought to be proved. He volunteered to testify in full. Underhill's Criminal Evidence (4th ed.), p. 201, et seq., §139; 8 Wigmore on Evidence (3d ed.), p. 438, et seq., §2276; *State v. Taylor*, 131 Me. 438, 163 Atl. 777; *State v. Thornton*, 174 Minn. 323, 219 N.W. 176; *Bolling v. United States*, 18 F. (2d) 863; *Gowling v. United States*, 64 F. (2d) 796; *Commonwealth v. Smith*, 163 Mass. 411, 40 N.E. 189; *Commonwealth v. Fortier*, 258 Mass. 98, 155 N.E. 8.

The judgment is reversed and the cause remanded for further proceedings in harmony herewith.

Mr. Justice Stone did not participate.