## No. 12,835.

### INGLES *v.* THE PEOPLE.
(6 P. [2d] 455)

Decided December 7, 1931.

52

Mr. S. Harrison White, for plaintiff in error.

Mr. Clarence L. Ireland, Attorney General, Mr. Edward J. Plunkett, Assistant, for the people.

*En Banc.*

Mr. Justice Butler delivered the opinion of the court.

Alexander Ingles, also known as Alex. English and hereinafter called the defendant, was charged with having murdered his wife's sister. He pleaded not guilty by reason of insanity at the time of the killing, was convicted of murder in the first degree and was sentenced to death. To obtain a reversal of the judgment, the defendant's counsel relies upon several assignments of error, which we will proceed to discuss. In view of the fact that there must be a new trial, we will omit a detailed statement of the evidence.

■■ 1. In rebuttal there were offered in evidence two alleged confessions. They were admitted over the defendant's objection that they should have been offered in chief and not held back for rebuttal. The fact that the defendant pleaded not guilty by reason of insanity did

not dispense with the necessity of proving that the defendant killed his sister-in-law, and that in doing so he acted deliberately and with malice aforethought, as charged in the information. The alleged confessions tended to establish the charge. Viewed in that light, they properly should have been introduced in chief. But they also had another bearing: namely, on the question of insanity. The defendant had introduced evidence tending to show insanity, and part of such evidence consisted of statements made by him several years before. It was material, in rebuttal, to show statements made by him immediately after the homicide, on the theory that such statements evidenced clearness of thought and expression, indicating a normal mind. In view of the fact that there must be a new trial, we express no opinion as to how far, if at all, the statements sustained that theory. They were offered, so the district attorney declared at the trial, solely for the purpose of rebutting the evidence of insanity. The fact that the statements involved an admission that the defendant killed his sister-in-law did not render them inadmissible in rebuttal for the purpose for which they were offered.

The order of proof is largely within the discretion of the trial court, and unless that discretion has been abused, a judgment should not be reversed for a departure from the usual order of introducing evidence. Jones, in his Commentaries on Evidence (2d Ed.), vol. 6. §2510, thus states the rule: "From preceding sections it is obvious that the order of proof is governed by certain general principles, which principles, however, are subject to relaxation when, in the exercise of discretion, the trial court deems that the ends of justice will be subserved thereby. It is obvious that the court may with equal propriety decline to relax those general principles when it deems that justice will not be subserved by a variation from the usual order. The rulings of the trial judge upon these matters are not, as a rule, reversible for error. The rules relating to the order of introducing

evidence are for the most part mere rules of practice; they are under the control of the court and subject to be varied in the exercise of a sound judicial discretion, so that a departure from the ordinary rules or a refusal to grant indulgence to a party cannot properly be made a ground of error. This has been illustrated in a large class of cases where the courts have granted indulgence in receiving evidence out of the regular order, in allowing witnesses to be recalled, in permitting evidence in rebuttal which should have been offered in chief, in supplying omissions and the like, or evidence in sur-rebuttal which should have been tendered in rebuttal. If the evidence is competent and relevant to the issues, appellate courts do not, as a rule, consider the question as to the order in which it was introduced. It is thus said with reference to rulings on the admission of testimony: 'It is firmly settled that the order of proof is committed to the discretion of the trial court, and it is seldom, if ever, that reversible error can be predicated on the exercise of such discretion.' '' And see *Hardesty v. People,* 52 Colo. 450, 121 Pac. 1023; *Irvine v. Minshull,* 60 Colo. 112, 152 Pac. 1150.

In the circumstances, we do not believe that the court abused its discretion.

■■ Moreover, to require a reversal an error must be such as tends to "prejudice the substantial rights of the defendant on the merits." C. L., §7103. In the Hardesty case, supra, we held that the introduction of evidence in rebuttal that should have been introduced in chief required a reversal of the judgment. But in that case the prosecution called in rebuttal two witnesses whose presence was not known to the defendant until they were called to the stand. Their testimony was in no sense rebuttal testimony, but belonged to the people's case in chief. The prosecution intentionally held the witnesses back until rebuttal in order to secure an undue advantage over the defendant by keeping him in ignorance of the names and presence of the witnesses, and sur-

prise him at the close of the case with evidence that he would be, and in fact was, unprepared to meet. The names of the witnesses were not endorsed on the information, as the law requires them to be (with an exception not applicable to that case) to enable the prosecution to call the witnesses in chief. C. L., §7070. The names of rebuttal witnesses are not required to be endorsed on the information, which circumstance, perhaps, suggested the adoption of the tactics resorted to. Other situations will readily suggest themselves, where the substantial rights of a defendant would be prejudiced. For example, if witnesses for the defendant who could have contradicted or weakened the evidence irregularly introduced on rebuttal had been excused and were unavailable.

No substantial right of the defendant was prejudiced by the ruling of the trial court in the present case. The defendant and his counsel were not taken by surprise. They knew of the existence of the statements before the trial; indeed, about two weeks before the trial the defendant's counsel made an unsuccessful effort to obtain copies thereof from the district attorney. It does not appear, and it is not even claimed, that any witness whose testimony might have contradicted or explained the statements was unavailable after the introduction thereof.

There was no reversible error in admitting the statements on rebuttal.

2. We have held repeatedly that it is not necessary for the prosecution to prove in the first instance that the defendant was sane, as every person is presumed to be sane until the contrary appears. See, for example, *Jordon v. People,* 19 Colo. 417, 36 Pac. 218; *Nesbit v. People,* 19 Colo. 441, 36 Pac. 221; *Shank v. People,* 79 Colo. 576, 247 Pac. 559. The defendant's counsel admits that this was the law before the passage of the act of 1927 (S. L. 1927, c. 90), concerning the plea of insanity; but he contends that when, pursuant to that statute, a defendant pleads not guilty by reason of insanity at the time of the alleged commission of the crime, the burden

is cast upon the prosecution to prove in the first instance that the defendant was sane. We cannot agree with that contention. To cast such burden upon the prosecution there must be some evidence tending to show insanity. A plea that the defendant was insane is no more evidence tending to show insanity than is an information or indictment evidence tending to show guilt.

The statute in question does not change the order of proof.

3. Chapter 90 of Session Laws of 1927 relates to insanity pleas in criminal cases. So far as it affects this case, section 1 is as follows: "If one of the defenses of the defendant be insanity, said defense must be pleaded orally, either by defendant or by counsel for defendant as a specification to the plea of 'not guilty' in the form 'Not guilty by reason of insanity at the time of the alleged commission of the crime.' * * *." The defendant entered such a plea; and, pursuant to section 2, the court committed the defendant to the Colorado Psychopathic Hospital at Denver, and ordered that the doctor or doctors in charge make observation of the defendant's mental condition and report findings to the court. At the expiration of the observation period the case was set for trial. Section 4 of the act provides that in case of a verdict of "not guilty by reason of insanity," the defendant shall be confined in the Colorado State Hospital at Pueblo under the laws governing that institution.

It is contended that the act violates section 23 of article 2 of our Constitution, providing that "The right of trial by jury shall remain inviolate in criminal cases * * *"; and section 25 of the same article, providing "That no person shall be deprived of life, liberty or property, without due process of law." If the defendant, instead of pleading not guilty by reason of insanity, had merely pleaded not guilty, and at the trial had offered evidence tending to show insanity, and the court had refused to admit such evidence, and the defendant had excepted to the ruling, the defendant would have been in a position

to raise the question now attempted to be raised. But instead of pursuing that course, the defendant entered his plea without objection.

In the circumstances, the question of the constitutionality of the act is not properly before us, and we express no opinion with reference thereto.

█ 4. Counsel contends that the court erred in refusing to give his requested instruction to the effect that in case the defendant is found not guilty on the ground of insanity, "the defendant is still accountable to the law and must be confined in the Colorado State Hospital for the insane at Pueblo under the laws governing that institution."

The duty of the jury was to determine whether the defendant was guilty or not guilty; and if guilty of murder in the first degree, to fix the punishment; and if not guilty, to determine whether or not it was by reason of insanity. They had no duty to perform with reference to the order to be made by the court in case of a verdict of not guilty by reason of insanity. Information concerning such order could not aid the jury, and should not be permitted to influence them, in considering the question whether the defendant was sane or insane.

Moreover, the words "accountable to the law," occurring in the tendered instruction, are objectionable. A defendant found not guilty by reason of insanity is sent to the state hospital for the insane, not because he is accountable to the law, but because he is not. In requiring him to be sent there, the law is not in any sense holding him accountable for the homicide.

The court did not err in refusing to give the requested instruction.

5. While the defendant was at the hospital for observation, not only was he observed and examined by those in charge, but information concerning him was obtained from third persons, through the hospital's social service agency and otherwise, the better to enable those in charge

of the hospital to arrive at a conclusion concerning the defendant's mental condition.

Section 2 of the act of 1927, supra, provides that such a defendant may be committed to "remain under observation" for the prescribed time, and that the judge may appoint a medical commission "to examine" the defendant during his stay at the hospital. It is contended that in seeking such information from outside sources the hospital staff acted beyond the power conferred by statute. In order to justify a reversal on such ground, it must appear that in this case some substantial right of the defendant has been prejudiced, and that depends upon the use made of the information so obtained; a question that will be discussed in the next division of this opinion.

6. We come now to the consideration of an error that requires the reversal of the judgment. Doctor George Johnson, assistant director of the Colorado Psychopathic Hospital called by the prosecution on rebuttal, testified that, in his opinion, the defendant, though retarded in his intellectual capabilities, was sane.

In detailing the procedure followed in arriving at this conclusion, the doctor stated that he personally observed the defendant and obtained from him his history, and that additional information was obtained in the following manner: Certain of the hospital force and employes investigated as many sources as possible that would likely give "us information pertinent to the man's mental condition," and in so doing "we investigate all those sources which are obvious contacts of the man, that is, contacts in the way of work, contacts in the way of church affiliations, contacts in the way of personal friends, family relationships and so on"; that "any individuals who have an especial contact, recognized by the individual himself, are likewise * * * interviewed, in order to obtain any information that may be pertinent as to the patient's mental condition. These proceedings are carried on by various officers of the institution. Following the ac-

cumulation of any information of that kind, likewise following the observation of the men in the ward, if necessary, of the various men attending, we have a class conference, at which time the patient is present, all the material that has been sent is gone over, a review of the case is made, and, depending upon the findings, the opinion is arrived at after a conference of each staff of the hospital, with all of those who have gathered information and investigated the case.'' The following testimony further explains the procedure followed: ''Q. In obtaining the history of Mr. English and his case, were fellow workmen also questioned? A. They were. Q. And one wife was out there? A. Yes, sir. * * * Q. Doctor, did you make these examinations yourself, personally, or did somebody help you in the institution? A. I have explained our procedure; information is gained by various officers of the institution, then that information is all assembled, we have our staff conference, at which time the patient is present. The symptoms, in the form of findings as they have been recorded, are presented, and the examination is continued in the light of the information that is at hand. Q. Yes, I understand that; but different ones make different examinations? A. Yes, and then they are all present, with the presence of the patient, and the situation is gone over, and all the information possible that we can assemble. Q. Now, Doctor, did you take statements from individuals that were brought in? A. We merely interviewed them in regard to information that they could give us as to his mental condition, under various environments, that is, various situations, which it was in point to get. Q. About how many different persons did you interview? A. Well, there were probably 15; I am not sure of that number. Q. And how did you get those persons? Did you send out and get them? A. We have a social service agency in relation to the hospital in which the personnel are trained workers, trained to go out and contact relatives for the benefit of patients of the hospital. That

particular plan is utilized in these cases. Q. These parties that you sent out for and who came in and made statements were not sworn at all? A. No. Q. Was the defendant present when they gave their statements? A. No, as a rule not."

Clearly, the court should not have permitted the doctor to state to the jury his conclusion based, in part, on the information thus obtained from third persons. Doubtless the method pursued would be an aid in determining, at least tentatively, the treatment to be given to a patient. The statute, however, does not direct or authorize a defendant's treatment at the Psychopathic Hospital; nor does it contemplate a trial of the defendant by the hospital staff; it provides merely for the observation and examination of the defendant while at the hospital.

■■ A physician is permitted to express his opinion based upon facts personally observed by him, in connection with the defendant's history given by the defendant to the physician; also to express his opinion based upon facts that are in evidence. In the latter case the opinion is stated in answer to a hypothetical question that assumes the truth of certain facts in evidence. He cannot express an opinion based, in whole or in part, upon information obtained from third persons who have not testified to the facts. A defendant is entitled to test the reliability of such statements made by a third person, by having the statements made under oath, and by cross-examining the person making them for the purpose of ascertaining and exhibiting the situation of the witness with respect to the defendant and other parties concerned in the transaction; his interest, motives and prejudices, if any: his means of obtaining a correct and certain knowledge of the facts testified to by him; the manner in which he has used those means; and his powers of discernment, memory and description.

That in the circumstances the opinion of the doctor was not admissible in this case, see Abbott's Trial Evidence (4th Ed.), p. 226, note 28; *Heald v. Thing,* 45 Me.

392; *Flanagan v. State,* 106 Ga. 109, 32 S. E. 80; *Miller v. St. Paul City Ry. Co.,* 62 Minn. 216, 64 N. W. 554; *Vosburg v. Putney,* 78 Wis. 84, 47 N. W. 99; *Birtwistle v. Public Service Ry. Co.,* 94 N. J. L. 407, 112 Atl. 193; *Howarth v. Adams Express Co.,* 269 Pa. 280, 112 Atl. 536.

That its admission in evidence prejudiced the substantial rights of the defendant cannot be doubted.

The judgment is reversed, and the cause is remanded for a new trial.