No. 16,519.
WALKER v. THE PEOPLE.
(248 P. [2d] 287)

Decided July 24, 1952. Rehearing denied September 8, 1952.

136

Mr. PAUL A. RUSTON, Mr. JAMES T. BURKE, Mr. ISAAC MELLMAN, for plaintiff in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. H. LAWRENCE HINKLEY, Deputy, Mr. NORMAN H. COMSTOCK, Assistant, for the people.

*En Banc.*

MR. JUSTICE CLARK delivered the opinion of the court.

DEFENDANT, Joe Sam Walker, charged by information with murder in the first degree, upon trial, was convicted of second degree murder.

At the beginning of the fall term of 1948 Theresa Foster enrolled in the freshman class in the engineering school of the University of Colorado at Boulder. Prior to her coming to college she had resided with her parents on a farm near Greeley, Colorado. She was in the eighteenth year of her life, a well-knit, vigorous young woman, about sixty-four inches in height, weighing about 130 pounds, and by reason of her outdoor farm life probably of better than average strength and vitality. She had been reared in a religious atmosphere and was quiet and unassuming in her demeanor. She is said to have had a steady attachment for a certain young man who resided at a considerable distance from Boulder, and

otherwise was not known to have had any dates. Upon coming to Boulder to enter the university, arrangements were made for her to live at the home of Dr. and Mrs. N. G. Messenheimer where she was to work part time as a domestic as consideration for her board and room.

On the evening of November 9, 1948, Miss Foster left the Messenheimer home and went to the Newman Club, a Catholic organization, to study with a tutor pursuant to previous arrangements. She was dressed in blue slacks, a gabardine jacket, and wore a white scarf over her head. She arrived at the Newman Club about 7:00 o'clock P. M., and left there alone about 10:00 o'clock that evening, carrying her school books. Failing to arrive home that night, her disappearance was reported by the Messenheimers very early in the morning of November 10th to Father Forsythe, who was in charge of the Newman Club, and also to the police department. Later report was made by the police department to the sheriff's office, and a search was instituted for Miss Foster. On the morning of November 11th between 10:30 and 11:00 o'clock, two rabbit hunters, not knowing of the disappearance of Miss Foster, came upon her dead body lying in the bottom of a ravine or ditch under the edge of a bridge crossing the same, some miles south of the City of Boulder on the Boulder-Golden highway. Report was promptly made to the sheriff's office. The upper clothing of the dead girl was up around her shoulders and neck, the lower part of her body being naked except for her shoes and anklets. In close proximity to the body on the floor of the ravine were also found her blue slacks and panties. Cursory examination disclosed that she had been the victim of a vicious attack, and had been subjected to a terrific beating. Her hair, head and upper clothing were blood-soaked and her face and the backs of her hands were scratched and lacerated, the skin containing many small particles of gravel indicating that these portions of the body had been ground into a gravelled surface or dragged or moved across such a terrain.

An autopsy performed on the body later that day further disclosed that the skull was a mass of bruises and cuts, particularly toward the back of the head. There was gravel in the mouth and in the nose. Externally the skull showed fifteen different cuts, and upon being reflected, the skull likewise showed numerous bruises and three depressed fractures. The brain also showed extensive bruises and considerable hemorrhage. An irregular bruised outline appeared over the front and side of the neck, and the hyoid bone on the right side was broken, accompanied by some hemorrhage. The cause of death, in the opinion of Dr. Lapi, who performed the autopsy, was given as strangulation. He further testified that in his opinion, following actual strangulation and death, severe pressure was continued to be applied for some considerable time, and that death by strangulation had resulted quickly due to loss of blood and other injuries previously sustained. There also was evidence indicative that rape had been accomplished.

On the morning of November 10th, before the sheriff's office had been advised of Miss Foster's disappearance, certain members of the sheriff's staff were called out on what is known as the Lee Hill road, north of Boulder, to investigate splotches of blood found there earlier that morning by Mr. Hummel and Mr. Wells, who were suspicious of someone having butchered one of Mr. Hummel's cattle. At this point and in the proximate vicinity of the blood spots at the side of the road, there was found that morning a cartridge clip, a safety latch, and a portion of the wooden grip from a 45 automatic pistol; also, a flash light which was slightly blood stained, and a bloody scarf, later identified as that worn by Miss Foster on the fateful night preceding. Three days later, near the same spot, there were found Miss Foster's glasses, a crescent wrench, on the threads of which were found fibers similar to those of Miss Foster's scarf, and some short lengths of folded bloody rope with hair attached to the dried blood.

On November 20th, the sheriff's office, having received information that defendant was in the habit of carrying a 45 automatic pistol in his car, officers went to his home at Eldorado Springs on a routine check. The Walkers were not at home, but when returning to Boulder the officers met them on the road, and there talked with defendant briefly; at that time he told the officers that he had borrowed such a gun from his brother-in-law, and that he had been in the habit of carrying it in the glove compartment of his car, but that he had sold the gun on November 5th to a man whom he did not know. Defendant was arrested on the following day, and upon being questioned by the officers at the county jail that evening, he denied having had any connection with the death of Miss Foster, claiming that he did not know and had never seen her. He again repeated the story about selling the gun belonging to his brother-in-law.

At the time of his arrest defendant was suffering from two head wounds, the most serious of which was toward the back of his head and had become infected. He explained these wounds resulted from a fall he incurred in crossing the creek near his home some time previous. On November 22nd, two of Miss Foster's school books were found near the Coal Creek road, a short distance from the bridge where her body had been recovered. Some further details having developed were called to the defendant's attention, but he still insisted that he had sold the gun as he had previously stated. On November 23rd the gun itself was found in the vicinity in which the school books had been discovered, and was identified by defendant's brother-in-law as being the gun owned by him and which he had loaned to defendant.

After being informed of the recovery and identification of the gun, defendant stated that he was ready to make further disclosures and during the evening of the 23rd his statement was taken in shorthand, later transcribed, and, after his making one or two minor corrections, it was subscribed by him on November 26th in the

presence of officers. This statement, as People's Exhibit SS, is hereafter further discussed. Therein defendant admits that his previous story about the sale of the gun to a stranger was untrue, and was designed to conceal the fact that he had had the gun in his possession on November 9th. He also admitted that he induced his wife, on November 11th, to send his brother-in-law a check purportedly in payment for the gun and to date the check November 6th. Further, and more important, he admitted that he did know about occurrences in connection with the death of Theresa Foster. He told a story about having stopped at a stop light at a street intersection in Boulder and there being accosted by a young man who later introduced himself as "Doug," who asked him to take him and his young lady companion down town. Thereupon the young folks got in defendant's car; "Doug" introduced his friend as "Hunkie," whom he later learned to have been Theresa Foster. He stated that the young man was drinking and that he and "Doug" had several drinks of whiskey during the course of the ride. They drove out on the Lee Hill road where "Doug" insisted on taking over the driving. An argument ensued; he then drove out on the side of the road, stopped the car and got out; whereupon, "Doug" followed him immediately and hit him over the head with the gun which he had taken from the glove compartment. According to defendant's statement, a terrific battle ensued during the course of which he was rendered unconscious. When he came to, "Doug" had disappeared. He discovered the practically nude body of the girl in the trunk of his car with the feet protruding. The car keys, which he had extracted from the lock as he stepped out of the car and placed in his pocket, he found in the lock on the lid to the trunk of the car. In making this statement, he admitted that the story he had previously told the officers in getting the wounds on his head by falling into the creek was false, and that he actually had received them during his fight with "Doug." He stated

that he was confused and scared upon finding the body of the dead girl in the trunk of his car, and thereupon he chucked the feet inside and started towards home, going through the town of Boulder by a circuitous route, and admits throwing the body over the railing of the bridge into the ravine where it was found as hereinabove mentioned. The statement continues about the manner in which he disposed of certain other articles, including Miss Foster's clip board with papers attached, and about how he found the gun on the shield on the inside of the rear bumper of his car on the following day and later threw it out onto the prairie.

The defendant did not testify in his own behalf. The only evidence in the record indicating that possibly some man other than the defendant may have been responsible for the murder of Miss Foster is what was contained in the statement made by defendant himself, to which we have hereinabove referred, Exhibit SS. No witness testified as to having seen defendant, "Doug" and Miss Foster together or as to having seen "Doug" in company of either defendant or Miss Foster. One witness, a waitress at the Nifty Nix Cafe, testified that on the evening of November 9th, between 10:00 and 10:30 o'clock, she served defendant at that drive-in with a bottle of beer, and his companion with a cup of coffee, and describes the girl then in the car with defendant as a blonde, rather husky, girl, dressed in blue or black slacks, and wearing glasses. Other witnesses describing the color of Miss Foster's hair refer to it as either light brown or dark blonde color.

The verdict of the jury was returned on the afternoon of May 9, 1949. Due to numerous delays and continuances the matter was not finally submitted to our Court until March 17, 1952.

Defendant sets forth 27 separate assignments of error. The record contains nearly three thousand folios, besides many exhibits in connection therewith. We have read and considered every word and sentence thereof. We

shall undertake the discussion of the assignments in the order of presentation thereof in defendant's counsel's brief.

## I.

First, it is contended that the trial judge committed error in refusing to disqualify himself upon defendant's motion. This topic covers assignments numbers 4 and 5. ██ Assignment No. 4 relates to the refusal of the trial judge to disqualify upon petition of defendant so demanding; and No. 5 that said trial judge was, by reason of the filing of the petition for disqualification, ousted from jurisdiction and had no right to further proceed. If defendant's counsel are right in their contentions in this aspect, then the whole proceedings would be a nullity and reversal would have to be ordered; however, the sole question determinative of this issue is whether, as a matter of law, the petition and supporting affidavits were sufficient in form and substance.

The applicable statute is section 1 of chapter 170, '35 C.S.A., the pertinent parts of which read as follows:

"§1. * * * In any criminal cause pending in any court of record of competent jurisdiction, the judge of said court shall be deemed incompetent to hear or try said cause in either of the following cases:

* * *

"Third—when the judge is in any wise interested or prejudiced * * *, such prejudice of the judge must be shown by the affidavit of at least two credible persons not related to the defendant."

In general, it may be said that the application of a defendant seeking disqualification of a judge, to be sufficient in law for that purpose, must set forth the facts upon which the conclusion of the pleader is based. The facts in each instance will vary in accordance with the peculiar situation therein pertaining, but, as a general rule, sufficient factual matters must be stated to show bias and prejudice on the part of the trial judge to the extent that it may reasonably and substantially appear

that his actions during the course of trial will be so influenced against defendant that a fair and impartial trial may not result. The prejudice of a trial judge must be shown to be directed toward the defendant, individually, either as a result of personal dislike or feeling against the defendant, or that such prejudice may have resulted by reason of animosity toward some group or organization with which the defendant may have been associated or closely affiliated. Personal opinions of a trial judge concerning issues in the cause before the court, or even as to the guilt or innocence of a defendant in a criminal case, are generally not regarded as disqualifying the judge unless his opinions be so pronounced that it can reasonably be said that he will be biased and prejudiced thereby during the trial. Due to variations in statutes and constitutional provisions of different jurisdictions and the variety of interpretations which have been placed upon them by the courts of other states, it is difficult to completely reconcile all of the authorities along these general lines. Fortunately, however, in the instant case it is unnecessary that we go beyond the decisions of our own court for a disposition of this question.

In *People ex rel. v. District Court*, 60 Colo. 1, 152 Pac. 149, cited by counsel for both the people and defendant, a number of very definite rules were laid down as the basis for a petition of the kind here involved, which principles have been adhered to from and since the rendition of that decision. If the petition be sufficient in form, and whether the allegations therein contained be in fact true or false, if they be set forth as *facts* they must be so accepted and the judge may perform no further duty than that of entering an order of disqualification. He may not pass upon the facts, but he has the right, and it is his duty, to pass upon the adequacy of the petition as a matter of law. The mere statement of opinion or conclusion of the bias on the part of the trial judge is not sufficient. "On the contrary, the facts from which the incompetency or prejudice is infer-

red must be stated. We have always required as essential to a proper recusation, a statement of facts therein sufficient to disclose the incompetency of the judge." *People ex rel. v. District Court, supra,* p. 8. See, also, *Young v. People,* 54 Colo. 293, 297, 130 Pac. 1011; *Erbaugh v. People,* 57 Colo. 48, 140 Pac. 188.

In *People ex rel. v. District Court, supra,* the rule of reason also is given approval, and at page 10 of the report we find the following statement: "No particular facts are recited in the statute as constituting prejudice, * * * and it would, therefore, seem that if there are any facts and circumstances disclosed from which a deduction could reasonably be made that a judge has a leaning toward one side of a question involved, from other considerations than those belonging to it, or a bias in relation thereto which would in all probability interfere with fairness in judgment, he is incompetent to try the cause for he is then, within the meaning of the statute, prejudiced."

At this point is cited with approval in that opinion the case of *People v. Findley,* 132 Cal. 301, 304, 64 Pac. 472, 473, from which is quoted the following language: " 'The affidavit or affidavits must not only state *facts,* but the *facts* stated must establish to the satisfaction of a reasonable mind that the judge has a bias or prejudice that will in all probability prevent him from dealing fairly with the defendant.' " (Emphasis supplied.)

It is therefore obvious that our court has emphasized the rule that the petition must state facts, and that mere conclusions are insufficient.

We now turn our attention to an examination and analysis of the petition for change of judge. In the first paragraph simply the nature of the action is stated. In the second paragraph it is related that the judge is prejudiced against the defendant and therefore disqualified—purely a conclusion.

In the latter part of paragraph three and again in

paragraphs four and five, prejudice is alleged because of various rulings made by the trial judge on matters previously having come before him in this case. Granting the accuracy of these statements, nevertheless, in the consideration of a petition of this kind, they do not set out such facts as have any bearing upon disqualification.

"The previous rulings of a judge although erroneous, numerous, and continuous, especially when they are subject to review, are not sufficient to show such bias or prejudice as would disqualify him." 33 C.J., p. 1001, §156.

"The right to disqualify the presiding judge is based upon an assumed prejudice or bias on his part, and not upon his views regarding the law of the case." citing cases. *State ex rel. v. Taylor,* 42 N.M. 405, 79 P. (2d) 937, 939.

 In a civil action we recently declared the principle that: "The interest of a judge upon which he may disqualify himself must necessarily relate to the subject matter of the litigation, * * * and not as it might relate to a determination of the facts and legal questions presented. Primarily, it is the duty of a judge to sit in a case in the absence of a showing that he is disqualified." *Kubat v. Kubat,* 124 Colo. 491, 238 P. (2d) 897, 899.

In paragraph 3 of the petition it is charged that the trial judge, in interviews with representatives of the press, misstated his rulings on motions, and the effect thereof. It is not charged that he made any statement whatsoever showing bias or prejudice against the defendant, nor that he made any disparaging remarks to the press about defendant.

In paragraph 6 is found the only charge which could be considered to have possible merit. In this paragraph the judge is charged, in effect, with having signalled counsel for the prosecution to make improper objections "so that he could sustain the same," during the taking of depositions on March 11, 1949. Analyzed, the only fact is that the judge "beckoned, bowed and signalled," all other portions of the paragraph being pure speculation,

conjecture and conclusions of the pleader. If these conclusions are in anywise borne out by the record it would have been a simple matter to have set forth in the petition exactly what had occurred upon these occasions when it is said that the judge passed these signals. That the judge beckoned, bowed and signalled, without relation to other facts, supporting an improper motive in so doing, creates only an impression of being fanciful, if not frivolous, and indicates an extremely low regard for the integrity of one occupying the responsible position of judge of our highest nisi prius courts. Suspicion, surmise, speculation, rationalization, conjecture, innuendo, and statements of mere conclusions of the pleader may not be substituted for a statement of facts. Neither is it alleged nor shown that any of the depositions taken at that time were ever used or introduced in evidence during the trial.

In the 7th paragraph of the petition is the statement that "it is the belief" of petitioner that he cannot have a fair trial before Judge Bradfield for the reason that said judge "has previously expressed and exhibited a determination to bring about a conviction, and if possible, the execution of the petitioner, regardless of the law or the facts, due to his abiding and unsurmountable prejudice." If it be true that the judge "previously expressed and exhibited," why are the facts not stated? Hard and bold language, but not one *fact* to sustain a single conclusion, is contained in the paragraph.

There also is a well-recognized rule that applications for the disqualification of a trial judge must be filed at the very earliest opportunity. Ordinarily this requires the filing of such a petition promptly upon the service of the information or at least by time of arraignment of the defendant in a criminal case. Usually the bias or animosity of the judge will be known to the defendant, or his counsel, at that time; hence the rule requiring prompt action. It is conceivable that in certain circumstances the fact of bias or prejudice on the part of

a judge might not be ascertainable for some time after the filing of the information, but in such a situation a statement should be forthcoming showing the reason why the petition was not sooner filed. In the case at bar information was filed on November 24, 1948, and two separate continuances were granted to January 27, 1949, to enable defendant to acquire counsel, which he did on January 17, 1949. From that date until the filing of the motion to disqualify the judge on March 17, various and numerous matters had been taken up before the court and rulings made thereon, many of which were favorable to defendant. At that time the pertinent question concerned repeated demands of counsel for defendant for a further continuance of the trial until September, 1949, which the judge denied. We already have ruled that the petition for disqualification is insufficient as a matter of law. We now also rule that, under the circumstances of this case, it was not filed within apt time. *Erbaugh v. People, supra; State ex rel. v. Taylor, supra.*

II.

One Black was called as a witness on behalf of the state and testified concerning meeting defendant and having taken a ride with him one evening some two months or so prior to November 9, 1948, and that at that time he saw a 45 automatic pistol in the glove compartment of defendant's car. He further testified concerning a conversation between himself and defendant covering a wide variety of topics, among others—and over defendant's objection—that defendant related to him that he had previously undertaken to pick up two coeds and that one would have gone with him except "the grandma with her pulled her out." An alleged error upon the ruling of the court permitting the witness' answer to stand is covered by assignment 10 and an instruction in connection therewith by assignment 11. It is contended that the instruction was improper as not being based upon any evidence in the case, and that the whole matter was highly prejudicial to defendant. By instruction No. 12

the jury was told that testimony of the witness Black was admitted for a limited purpose only, that being "as to bearing, if any, upon the defendant's attitude of mind, if any, tending to show a plan, scheme, or design, to produce a result similar to the act charged in the information."

It is contended that because of the circumstance that the evidence is so evenly balanced as to the guilt or innocence of defendant of the crime with which he is charged, that this evidence and the instruction were materially prejudicial to defendant. We cannot so construe the record. In fact, we are convinced that because of the vast array of evidence that much more directly implicates the defendant, this item is of no probative value. It is debatable whether the objection should have been sustained, but even though it was not, the error, if indeed it can logically be said to have been error, was so slight and insignificant that we are certain it had no effect whatsoever upon the jury's conclusion. By the instruction, the offer was limited to but one purpose, being one upon which the general evidence in the case is vast and overwhelming, rendering this microscopic indeed. We have many times held that the admission of evidence, which cannot have influenced the jury, is harmless. *McQueary v. People,* 48 Colo. 214, 217, 110 Pac. 210; and that, "mere possibility of prejudice is insufficient to warrant a reversal." *O'Loughlin v. People,* 90 Colo. 368, 380, 10 P. (2d) 543.

### III.

 Counsel for defendant, in their argument, stress their contention that people's exhibit SS, the question and answer statement of defendant made on November 23, 1948, hereinabove referred to in the statement of facts, was erroneously admitted. This refers to assignments 14 and 15. Counsel insist that the defendant was subjected to harsh and cruel treatment by being questioned unduly and at length by officers working in relays at a time when, due to physical distress, he was

unable to have the full exercise of his mental processes and that by reason of said undue pressure his statement was not made voluntarily. It is asserted that this constant questioning of defendant continued even after the taking and signing of the Exhibit SS and for a total period of sixty-seven days. We have diligently searched this entire record and we are frank in saying that it does not bear out these implications. It is true that on the evening of the day of defendant's arrest, when he was first questioned, he was suffering from the effect of infection in the wound at the back of his head, and that a doctor was in attendance and treated that wound at intervals throughout the evening. It also appears that for the ensuing twenty-four hour period nurses were kept in attendance upon defendant, for the sole purpose, however, of carrying out the medication as directed by the doctor. The doctor testified, that notwithstanding defendant's physical disability at that time, he was entirely capable of the full exercise of his mental faculties and was in no manner incapacitated from understanding the situation with which he was confronted. He was given considerate treatment and in no way was advantage taken of him. At the time the statement was made, his pulse, heart action and respiration were normal, and he was under no apparent physical distress. He expressed complete willingness to make the statement.

The trial court apparently treated Exhibit SS as a confession. When objection was made to its admissibility, the jury was excused and all of the witnesses examined for the purpose of determining the question of voluntariness. Assuming the statement to be in the nature of a confession, counsel for defendant rely upon the case of *Watts v. Indiana,* 338 U.S. 49, 69 Sup. Ct. 1347, 93 L. Ed. 1801, as authority for their position. The Watts case was fully discussed in *Downey v. People,* 121 Colo. 307, 215 P. (2d) 892, and what we therein said is equally applicable in this case; we quote from the opinion in that case the following, appearing at page 318 of the Colorado

152

report: "We hold that the law enforcement officers of the state in their effort to solve a murder case, in the interest of justice, must have a reasonable latitude in arresting and questioning one justifiably suspected of being the murderer, and if in so doing the investigating authorities give proper consideration to the comfort and well-being of the suspected person, and conduct themselves in a manner free from threats, promises, or mistreatment of the suspect, a confession thus secured may be received in evidence, even though it was the result of several extended periods of interrogation of the accused." The above quotation expresses precisely the situation which exists in the instant case, and justifies the action of the trial court in overruling the objection, if this statement be treated as a confession.

This brings us to a consideration of the issue in its true light: Was defendant's statement a confession? It will be remembered that in this exhibit defendant admitted falsehood in his previous oral statements in three important particulars: (1) With respect to the gun; (2) that he knew nothing about the disappearance of Miss Foster; (3) that he obtained the wounds upon his head by falling into the ravine near his home. In this statement he admitted having had the gun in his possession; he stated that the wounds upon his head were caused by having been struck by that gun in the hands of another; and while he denied responsibility for Miss Foster's death, he admitted knowing a great deal about it. Thus it is seen that portions of the statement are admissions against interest and the remainder thereof is purely exculpatory. Early in the history of this jurisdiction in the case of *Mora v. People,* 19 Colo. 255, 35 Pac. 179, the principle was announced that where one accused of a crime makes a statement denying the criminal act and explaining suspicious circumstances for his own advantage, his statement is not a confession and need not be voluntary. This holding was cited with approval in *Sweek v. People,* 85 Colo. 479, 486, 277 Pac. 1, and

*O'Loughlin v. People, supra.* Also in the Mora case our court said, in effect, that evidence of falsehood by the accused in giving an account of himself, or of the transaction and his relation to it, is competent as affording a legitimate presumption of guilt, and that for this purpose the prosecution may first prove such declarations and then prove their falsity. The Mora case also is cited in *Bruner v. People,* 113 Colo. 194, 206, 156 P. (2d) 111. In the Bruner case we went to some length in defining the term "confession," and specifying the difference between a confession and an admission contained in an exculpatory statement, and held that such admissions are admissible in evidence without proof of voluntariness. The defendant's statement here under discussion comes squarely within the rules announced in the Bruner case, which announcement we adopt by reference without repeating.

### IV.

Next, we consider assignments 19 and 20, the first relating to the giving of instruction No. 15, and the other to the refusal of the court to give defendant's tendered instruction No. 1. Instruction No. 15 given by the court reads as follows: "What is meant by circumstantial evidence in criminal cases is the proof of such facts or circumstances connected with or surrounding the commission of the crime charged, as tend to show the guilt or innocence of the party charged; and, if these facts and circumstances are sufficient to satisfy the jury of the guilt of the defendant beyond a reasonable doubt, then such evidence is sufficient to authorize the jury in returning a verdict of guilty." The first paragraph of defendant's tendered instruction No. 1 is practically identical with the instruction given by the court exclusive of the following: "as tend to show the guilt or innocence of the party charged." Then is added a second paragraph to the effect that where conviction is sought on circumstantial evidence alone, the people must not only show beyond a reasonable doubt that same are true, "but the

facts and circumstances must be of such as are absolutely incompatible, upon any reasonable hypothesis, with the innocence of the defendant, and incapable of explanation upon any reasonable hypothesis other than that of the guilt of the defendant." It is contended that the omission of this second paragraph is reversible error.

Defendant's tendered instruction No. 1 might well have been given by the trial court, but under the circumstances disclosed by this record, he committed no error by not giving it. The usual instructions on burden of proof and presumption of innocence were given. Since the second paragraph of the tendered instruction relates only to the weight of the evidence, it is said that the failure to give such an instruction does not amount to misdirection but is only nondirection. The problem involved might well have presented a serious question were it not for the fact that it has been settled in this jurisdiction in the case of *Smaldone v. People,* 103 Colo. 498, 88 P. (2d) 103, where the exact contention was presented. This statement is made not only in reliance upon the case as reported, but also we took the extra precaution of examining the record in the Smaldone case. Therein it is disclosed that the instruction given, as well as that tendered but refused, on circumstantial evidence in that case was substantially in the same form as those involved in the present one. The Smaldone case was cited and quoted from with approval in this respect in the later case of *Montez v. People,* 110 Colo. 208, 132 P. (2d) 970.

V.

Vigorous exception is now taken to instruction No. 3 given by the court, although no objection was made thereto at the time of trial, nor was any mention of it made in the motion for new trial; and to instruction No. 4, to which defendant did object when it was given. These appear as assignments 16 and 17, and we shall discuss both together.

The gist of the argument of defendant's counsel is

that, in view of the fact that the evidence was entirely circumstantial, the court committed error in instruction No. 3 by quoting therein a portion of the statute to the effect that in finding murder of the first degree the jury shall fix the penalty at either life imprisonment or death, and that in instruction No. 4 the court erred in referring to the evidence as "some direct and some circumstantial," in that thereby the court gave the jury the definite inference that there was evidence which would justify the finding of first degree murder, and perhaps thus confused the jury to the extent that it compromised its verdict to find the defendant guilty of second degree murder rather than to acquit him. While we do not approve of the forms of these two instructions, it is not a question of determining whether or not they were technically correct, but is one of determining whether or not defendant could have suffered prejudice on acount thereof. We recognize the principle that in case of doubt, the defendant is to be given the benefit thereof, but in this instance it is so clear that defendant could not possibly have been prejudiced in any respect by anything the court said in these instructions that there is no question of doubt. While at trial the entire last portion of instruction No. 4 was objected to, it now appears clearly that certain portions thereof were necessary, and it comes down to a single inadvertent statement of the court that there is "some direct" evidence. It is said that this is a comment upon the evidence. True, the remark had no place in the instruction, but it cannot be said to be a comment upon the evidence which would entail a relation or narration of certain evidence. Had the court said in effect that the evidence is wholly circumstantial and therefore the death penalty may not be inflicted, such would have been no more a characterization of the evidence than here appears, and would have been a proper statement. That, in effect, is what the court was telling the jury, and his instruction on this point is so clear that the jury could not possibly have misunder-

stood its meaning. *Reagan v. People,* 49 Colo. 316, 326, 112 Pac. 785. He went on to say that, "the evidence herein does not warrant the death penalty, and therefore same is withdrawn from your consideration. * * * If you find the defendant is guilty of murder of the first degree * * * then you will in your verdict fix the penalty" at life imprisonment. This is very explicit language and it is only by devious and illogical treatment of the subject on a technical basis that permits the position taken by defendant's counsel, and with which we cannot agree. In fact, after a review of the entire record and a study of the instructions given, we are firmly of the opinion that the instructions as a whole were more favorable to defendant than the situation demanded. For instance, the court gave no instruction to the effect that if the jury should find that the defendant committed the murder in an attempt to rape, or in the perpetration of a rape, findings of malice, deliberation, premeditation and intent are not necessary elements of the crime charged and need not be proved. *Frady v. People,* 96 Colo. 43, 48, 40 P. (2d) 606. Also, the court gave complete instructions, and submitted to the jury forms of verdict, covering manslaughter, both voluntary and involuntary. One cannot read this record and find any justification whatsoever for giving of instructions, or submitting forms of verdict, on manslaughter because he who caused Theresa Foster's death (and the jury found that it was this defendant) was unquestionably guilty of murder. A verdict of murder in the first degree would have been fully supported by the record in this case.

Furthermore, the entire matter relating to circumstantial evidence, and its effect in preventing the jury from fixing a death penalty, relates to first degree murder, and cannot in any respect be relevant to a verdict of guilty of the second degree. If, then, it be conceded solely for the purpose of argument, that the instructions were erroneous, nevertheless, the defendant having been convicted of second degree murder was not

entitled to complain. In 26 American Jurisprudence at page 546, section 557, we find the general rule clearly stated as follows: "The rule that the accused cannot complain of an error in instructing the jury as to the higher degree of the crime charged where the jury is properly instructed as to the lower degree and returns a verdict of guilty of the lower degree is especially applicable with respect to charges upon the different grades and degrees of culpable homicide. Thus, error in a charge upon first degree murder is not to be deemed prejudicial to one convicted of a lower degree of murder, voluntary manslaughter, or involuntary manslaughter. While it is true that a person on trial for murder is entitled to have his theory of the case submitted to the jury, yet, if under his own theory he is guilty of manslaughter, and is convicted of that crime only, his rights are not prejudiced by a failure to present his theory of the defense by specific instructions." This likewise is true where the error relates to first-degree murder and defendant is convicted of murder of the second degree as we specifically held in *Ryan v. People*, 50 Colo. 99, 106, 114 Pac. 306. The contention that the objectionable parts of the instructions may have influenced the jury to compromise their verdict "rests upon conjecture, merely, and cannot be entertained. We must assume that the jury performed their duty intelligently, and with a correct understanding of the charge of the court." *Mackey v. People*, 2 Colo. 13, 17, 18.

## VI.

In the order of defendant's counsels' presentation in argument we now come to their first assignment: that the verdict of the jury was contrary to the evidence. What we already have said substantially answers this question, and we add thereto, only for the reason that it would now appear from counsels' argument that the contention is here for the first time being made that if defendant be guilty at all he is guilty of first degree murder. Had such a contention been

maintained at the time of trial, and objection offered to the giving of instructions pertaining to anything except first degree murder, this would have presented a difficult question and possibly might have come within the doctrine announced in the case of *Dickens v. People,* 67 Colo. 409, 186 Pac. 277. In the instant case, however, the court not only instructed upon second degree murder, but also upon the two degrees of manslaughter, without objection on the part of the defendant's counsel and presumably with their full approval. They may not now successfully complain that the jury favored defendant with a verdict in a lesser degree than the evidence would seem to indicate might have been proper. In the last analysis, the matter rested entirely in the hands of the jurors and it is presumed that they did their duty as in their conscience and under their oaths they believed it to be. They were the finders of fact, and although one may disagree with their findings and believe them possibly to have been prompted by perhaps some element of unwarranted question of doubt as to first degree, or for some other unknown reason, yet it is our duty to respect the announced results of their labors where there is evidence to support their verdict. Certainly there is ample evidence in this record.

## VII.

Following the classification adopted by defendant's counsel in presenting their argument, we come to a group of assignments under the heading that defendant did not have a proper trial nor one according to due process of law as guaranteed by the Constitutions of the United States and of the State of Colorado. The items under this heading are: (a) That the jury panel was improper and not in conformity with statutory procedure, covered by assignment No. 7; (b) Restriction of cross-examination, referring to assignment No. 12; (c) Denial of defendant's request for further continuance in order to prepare for trial, covered by assignment No. 21; (d) Refusal of the trial court to permit inspection of

evidence, covered by assignment No. 22; and taking exception to remarks of the district attorney in his closing arguments concerning the defendant's failure to inspect said evidence, covered by assignment No. 23; (e) Refusal of the court to grant defendant's petition for citation of the publishers of a Denver newspaper, set forth in assignment No. 6; (f) Refusal of the court to grant a motion for a mistrial, for reasons set forth specifically in assignment No. 8; (g) A comment by the court to the effect that a certain delay was caused by counsel for defendant, specifically covered by assignment No. 13.

An extended discussion of each of these assignments would lengthen this opinion unreasonably. With the exception of subdivisions (a) and (d) the assignments relate to subjects which have been heretofore many times discussed in opinions of this court, and with the possible exception of (e), all are matters which lie within the discretion of the trial judge. The fact that we do not here treat these assignments at length does not indicate that we have not given them careful consideration. From our study of the complete record, we find that they are without merit and that in no instance can it properly be said that the trial judge abused his discretion.

Under subdivision (a) objection is made as to the manner in which the jury panel was provided, and it is contended that because there were only 84 persons on the active panel at the time the selection of the jury was commenced, it inevitably follows that defendant was deprived of the type of jury to which he was entitled to try his case. In argument, generalities are indulged, and it is not clear as to the exact manner in which it is charged that defendant suffered any prejudice in this connection. From the presentation, one would be led to believe that counsel are of the opinion that the petit jury to be in attendance at court time shall comprise the full number of those whose names are required to be put in the jury box pursuant to the provisions of section 10,

chapter 95, '35 C.S.A., as amended by section 1, chapter 130, S.L. '43, page 390, which in the case of Boulder county, was three hundred. As a matter of fact, this statute is directory only of the number of names to be submitted to the clerk of the court to be placed in the jury box, and the petit jury required for attendance at court time is drawn from this box as provided by section 13 of said chapter 95, '35 C.S.A., the names so drawn being placed in a separate box as the jury panel for the trial of cases at the ensuing term. As a matter of practice the number to be drawn is usually determined either by consultation with the judge or pursuant to his written order, the intention always being to have available as a petit jury only such number as may reasonably be ample to try the cases on hand. In the instant case, with 84 jurors present and after the sustaining of all peremptory challenges to which the defendant was entitled and such as the People wished to exercise, there still remained one name in the box. This is related in some detail only as illustrative of the fact that there certainly was no irregularity in the proceedings concerning said jury, and no reason why the defendant was entitled to object to the jury panel.

Under subdivision (d) complaint is made that the trial court refused to permit the inspection of articles, which it was assumed the district attorney would offer in evidence. On the 5th day of April, 1949, twenty days before the commencement of trial, defendant moved that the court appoint Dr. Manns as an expert witness on behalf of defendant and at the People's expense, which motion the court granted. Immediately thereafter defendant further moved for an order of court permitting Dr. Manns to have access to, for examination and inspection, and to make independent and different tests upon, various items and materials in the possession of Dr. Lapi and Dr. McConnell without specification as to the exact items. The trial court denied the motion on the grounds, first, that it was not sufficiently definite;

and second, that he had no right "to require the district attorney to disclose his evidence at this time." When, if ever, in a criminal case, has a defendant, upon demand of his counsel, the right to an order requiring the production of articles or materials in the custody or under the control of the officers? "If, *under any circumstances,* the motion was good its allowance seems clearly discretionary, reviewable only for gross abuse and none such is disclosed." *Massie v. People,* 82 Colo. 205, 217, 258 Pac. 226. (Emphasis supplied.) There doubtless are many cases which relate to articles such as we have under consideration here, but if so, none, other than the Massie case, supra, cited by the Attorney General, has been called to our attention. Other cases cited all pertain to instances where demand was made to permit inspection of some type of document, usually a confession or statement previously made by defendant or some close associate. Counsel for defendant rely strongly upon what we said in the case of *Battalino v. People,* 118 Colo. 587, 597, 199 P. (2d) 897, followed in *Struna v. People,* 121 Colo. 348, 215 P. (2d) 905. An analysis of the Battalino case discloses that all we actually held therein was that an unsigned copy of an alleged statement was not competent evidence, even for impeachment purposes, and therefore an order for inspection was properly refused. True, we also said therein, page 597, "The granting or refusal of the accused's request for inspection of written statements of a witness for the prosecution has been held to lie in the discretion of the trial court," followed by some further discussion of this principle; but we also said, "There are cases holding to the contrary." Certainly this cannot be construed as an expression of opinion by this court, notwithstanding that it was apparently so taken in the Struna case, supra, in which the Battalino case only, is cited as authority.

A study of the Battalino and Struna cases also discloses that in neither was demand made for production of documents for pre-trial inspection. The issue of dis-

covery was not involved. They pertain only to the proposition of demand to produce documents during course of trial for the purpose of impeachment, the foundations for which had been laid. The discussion therein relative to the law of pre-trial discovery was not necessary to a determination of the questions presented by the records in those cases, and they are limited as authority to the issues thereof. The controversy before us in this case is vastly different.

In the case of *Silliman v. People*, 114 Colo. 130, 162 P. (2d) 793, the exact question was involved and, following a rather lengthy discussion beginning at page 136 of the Colorado report, a definite ruling is laid down at page 138 where it is said that, from an examination of all the decisions pertaining to this subject, it appears that, "the *right* of examination and inspection is purely statutory," and that, "in the absence of statute the right of examination and inspection is nonexistant. * * * No statute giving the right of examination and inspection prior to the time an exhibit is actually offered in evidence is to be found in our jurisdiction." (Emphasis supplied.) This is clearly in conformity with the general rule stated specifically in 14 American Jurisprudence, page 915, section 210, and further discussed in 17 American Jurisprudence, page 18, section 25. Attention, also, is called to the recent decision of this court in *Rosier v. People*, 126 Colo. 82, 247 P. (2d) 448, case No. 16758, announced on July 14, 1952, after this opinion was prepared but before its adoption by our court.

The right of discovery in criminal cases is not recognized at common law. *Shores v. United States*, 174 F. (2d) 838, 11 A.L.R. (2d) 635. The genesis of the theory of pre-trial discovery and inspection lies in the rules of equity, which have presently been enlarged in most jurisdictions to apply in practically all civil proceedings. It is readily apparent, however, that the tools of equity are in nowise fitted to the mechanics of the trial of a criminal case. The doctrine of discovery is therefore a

complete and utter stranger to criminal procedure, unless introduced by appropriate legislation.

If a defendant in a criminal case is not entitled as a matter of right to an order for inspection of written documents, then certainly the rule should be not less, but more strictly, maintained with respect to exhibits of types such as were involved in this case, which included blood and other stains, hair, fibers, and similar materials, upon which it was contemplated to conduct chemical experiments. It takes little imagination to visualize the extremity to which such "prowling" might be extended should opportunity be afforded, and the serious effect that might result therefrom. If it be recognized that in rare and extreme instances the court might, under its inherent power and in the interest of justice, be justified in requiring the prosecution to permit inspection of exhibits in the hands of officers, such power should be exercised with great caution. Nothing appears in this case beyond that usually found in similar criminal proceedings, and the trial judge was correct when he said that here he had no right to grant defendant's request. Under the facts of this case defendant had no right of discovery or inspection, and the trial court was without right or discretionary power to grant the demand.

## VIII.

Assignment No. 24 is that the court erred in not requiring an inquest to ascertain the cause of death of deceased, and in not requiring a compliance with the law concerning inquests. This is so far-fetched that its mere statement refutes it.

## IX.

Following the denial of defendant's motion for new trial, the court entered judgment sentencing him to the penitentiary for a term of eighty years to life, and by assignment No. 27 this is said to be error, in that it imposes "a cruel and unusual punishment contrary to the provisions of article 8 of the Constitution of the United States," to which, by amendment, counsel now

ask to add section 20, article 2, of the Constitution of Colorado.

The statute (section 32, chapter 48, '35 C.S.A.) provides for sentence upon conviction of second degree murder of not less than ten years with a life sentence as the maximum. If the constitutional provisions cited have any pertinency at all, they refer to the statute and not to the sentence, since the power to declare what punishment may be assessed against those convicted of crime is legislative and not judicial. "If the statute is not in violation of the Constitution, then any punishment assessed by a court * * * within the limits fixed thereby cannot be adjudged excessive." 15 American Jurisprudence, page 174, section 526.

Even if it be considered that the sentence is too severe, it does not authorize reversal and we could not direct the action of the trial judge, since that is solely his function where he has violated no law. Such matters must rest exclusively with the executive department of government, and we would not, even if the law permitted, substitute our conclusions, reached from the reading of a cold record, for perhaps the better grounded determination of the trial judge who witnessed the living drama of the trial in his own courtroom. *Olguin v. People,* 115 Colo. 147, 153, 170 P. (2d) 285; *Chasse v. People,* 119 Colo. 160, 164, 201 P. (2d) 378.

### X.

Counsel for defendant, in oral argument before us, while insisting that certain of their assignments relative to sufficiently grave errors which would justify reversal, conceded that others thereof, taken alone, were not of that category, but contended that all taken together indicated that defendant had not had a fair trial. To support this theory frequent reference is made, both in the oral argument and in the briefs, to the fact that the jury was out almost forty-eight hours before the verdict was returned. The implication, of course, is that the issue was so close and the evidence so uncertain that

it required that length of time to enable the jury to determine whether the defendant should be convicted or acquitted. It was not that simple. First, the jury had to consider a sizeable mass of evidence, and then, it must be remembered, choose between four degrees of guilt. We, likewise, yielding to conjecture and with no more positive information than have counsel, but after a careful study of the record before us, find it quite well within the realm of good logic and reasoning to believe that the difficulty encountered by the jury in agreeing upon a verdict was at best as likely to have been in deciding between second and first degree murder as it was the question of guilt or innocence. In any event, the whole concept is based upon surmise and conjecture, and being without supporting fact, is without force.

To say that one or two minor errors are of so little importance that reversal is not justified, but that when several such occur during trial it is imperative, is faulty and illogical reasoning. The test is not how many, but how material and prejudicial. Perhaps no trial of any extended duration is wholly free from irregularity in some respects, but only mistakes that materially and substantially affect a litigant's legal rights, and are prejudicial to his cause, justify reversal of the judgment. *Ingles v. People,* 90 Colo. 51, 54, 6 P. (2d) 455. If it be not prejudicial error, then it is not error in law. In this case, while many errors are alleged to have been committed during the course of trial, after searching the record we find none that could reasonably be said to have jeopardized, prejudiced or substantially affected the rights of defendant. Defendant was represented by able and zealous counsel who labored faithfully in behalf of his cause; he had a fair trial before an impartial judge and jury; he was found guilty of a revolting, senseless murder; there is nothing before us that justifies our interference with the judgment of the trial court; accordingly, it is affirmed.

Mr. Justice Holland dissents.

Mr. Justice Holland dissenting.

If we accept the record as it is before us, there is little therein to exonerate the defendant; however, the ultimate question is: Was this record fairly made? We cannot disregard the fact that an atrocious crime was committed; that the seat of the trial was in the same community of irate citizens; and that when the finger of suspicion was pointed in defendant's direction, and when the charge was finally laid against him, all accounts thereof were fully embroidered by the press, which should be the maximum of information and the minimum of comment before trial in criminal cases. With this setting, it is easy for the gossamer thread of prejudice to be invisibly woven into the fabric of guilt through the means of an unfair and partial trial. In my opinion, several prejudicial errors occurred, the combination of which was sufficient to tip the finely balanced scale of justice. In a crime of the highest degree, such as this, no one can safely say that any error, however slight, is not prejudicial. In such an atmosphere, the following expression of Robert Ingersoll is fitting, "Prejudice is the spider of the mind, it is the womb of injustice."

A motion was filed to disqualify the trial judge, which contained, in my mind, a statement of sufficient facts to arrest the attention of any trial judge. It is contrary to my idea of justice in a criminal case for a trial judge to attempt to preside as an impartial tribunal and determine his qualifications on the question of prejudice when the question showing reasonable apprehension has been raised by the defendant, because, as honest as the trial judge may be, he may not consciously be aware of the existence of the fact or accusation made against him. Certainly, no error obtains if a judge immediately disqualifies himself, thereby giving defendant the benefit

of doubt. This court has said that in such cases the trial court cannot go behind the facts presented in a motion for disqualification of the judge. Here the trial court recognized that situation; however, he discussed the facts and concluded that they did not disclose prejudice on his part. All of this is said with the greatest respect for the honorable trial judge in this case, whose honesty and integrity is beyond question; in my opinion, however, an unconscious prejudice throughout the entire proceeding lurked in his mind and to avoid any possible question of prejudice, he should have withdrawn gracefully.

Error is assigned as to the admission of the testimony of the witness Delbert Black, who testified for the people, in substance, that some two months or more prior to the date of the crime charged, while he was walking along the street in Boulder shortly after eleven o'clock P.M., defendant offered him a ride; that he and defendant then drove up Broadway toward the university, pulled over under a light, and stopped for a little while to drink some beer; that when he looked in the glove compartment in search of a can opener, he saw a forty-five revolver in a holster; that in the conversation, defendant told him that on a prior occasion he tried to pick up two co-eds and that one of them was all ready to get into the car, but the other pulled her out and they did not go. This testimony was admitted, over the objection of counsel for defendant, on the ground that it tended to show the attitude of mind of defendant, and a connection with his mental thoughts and tendencies. The court undoubtedly was laboring under the impression that this testimony related to the matter of similar offenses, which, in many instances, is admitted to show design, intent, and purpose. I wholly fail to see any rational connection between this incident and the crime charged. If defendant had murder in his heart, it is not reasonable to think he would be picking up *two* girls, much less talking about it. Intent is relevant to the issue

in the offense charged. The general rule is, that evidence is inadmissible which shows that the accused has committed a crime wholly independent of the one for which he is being tried. There are two exceptions to this rule, namely: (1) Evidence as to similar offenses that are not too remote in time to be of evidentiary value is admissible to show scheme, plan, design, motive, intent, knowledge or identity, or any combination thereof. (2) When the evidence of other offenses is so related and interwoven with the offense charged, that it is impossible to show such charged offense without relating the other offenses. The testimony here fails to come within either of the exceptions. First of all, the so-called similar offense is not an offense at all. An offense is the doing of that thing which a penal law forbids to be done, or omitting to do what it commands; therefore the act of defendant in offering the two girls a ride does not fall within the classification of a crime or offense. In the instance before us, where defendant did not take the witness stand, and his character was not in question, the admission of this testimony was an indirect attack upon his character. To come within the first exception to the rule, it must appear from the testimony that the similar offense is so connected in time, and *so similar* in other relations to the crime charged, that the same motive may reasonably be imputed to them all. *Housh v. People,* 24 Colo. 262, 50 Pac. 1036; *Elliott v. People,* 56 Colo. 236, 138 Pac. 39. It thus is to be seen that our court has definitely tied the admission of such testimony under the first exception to the rule to the question of connection in time and *so similar* in other respects. Where intent to murder is an element of the crime charged, it is wholly impossible to spell out of this occurrence a similar offense, and common-sense reasoning, as well as our own decisions, make the admission of the testimony prejudicial, and error that is insurmountable. The very wording of a part of the court's instruction No. 12 highlights the error, it is, " * * * that testimony was admis-

sible only as to a bearing, if any, upon the defendant's attitude of mind, if any, tending to show a plan, scheme or design to produce a result *similar* to the act charged in the information." What reasonable person could say that in a case where murder is charged, that testimony tending to show that defendant offered two girls a ride, would in any way show a connection with the mental thoughts and tendencies of the defendant relative to murder. We all know that such occurrences are common in our present-day life; however, a murder in connection therewith is the rare exception. In addition thereto, the testimony in this case does not disclose that defendant picked up the victim of this crime in the manner alluded to in the testimony of the similar offense, but it was sought to be established by the people that the defendant was seen at the "Nifty Nix Cafe" with a girl thought to be the deceased and with whom defendant was acting on friendly terms. This could well have been, and no one can say that it was not the turning point in the minds of a jury allergic to any slight suggestion, when an atrocious crime had been committed in their community for which someone should be punished.

We next come to the admission of exhibit SS, which is not a confession, but may be termed an exculpating statement wherein defendant denied his complicity in the crime, but explained incriminating circumstances. Some of this was taken while defendant was under treatment by a physician, and comes within the prohibition against the means employed in eliciting disclosures, statements, or confessions, and is clearly within the present-day, blown-in-the-bottle variety of attempts to prove defendant's guilt from his own mouth. When this method is allowed, the process and burden of proving the charge asserted is lightened, and the defendant is made the unfortunate instrumentality of his own conviction. I have not detailed the contents of this lengthy statement, but I ground my opinion on its prejudicial

effect, and I firmly assert that its admission was harmful error.

It was undoubtedly easy for jurors untrained in the technique of distinction, to have considered this to be a confession, and, of course, if it was so considered, then its admission after being obtained under the circumstances, was in violation of defendant's rights of due process.

Outside of this exhibit SS, which I have just discussed, there was nothing but circumstantial evidence in this case, and the court should have instructed the jury that such circumstances must be such as were absolutely incompatible, upon any reasonable hypothesis, with the innocence of the defendant, and incapable of explanation upon any reasonable hypothesis other than that of the guilt of the defendant. This the trial court erroneously refused to do, because there was no confession properly admitted as such in the case, therefore the case rested on circumstantial evidence and the trial court should have given an instruction along the line suggested.

By instruction No. 4, the trial court, after stating that, "No person shall suffer the death penalty who shall have been convicted on circumstantial evidence alone," then stated, "In this case the court finds while there is some direct and some circumstantial evidence, that as a matter of law, the evidence herein does not warrant the death penalty, and therefore same is withdrawn from your consideration. * * * " If there was direct evidence, as the court states, then it was the court's unquestioned duty to submit the death penalty under our statute. The words of the court above set out clearly fall within the prohibition against the trial court commenting on, or discussing the evidence. The court surely and unmistakably made a prejudicial comment by saying there was direct evidence of guilt, and in so many words said there was circumstantial evidence sufficient to warrant a conviction of murder in the second degree. The province of the court in this matter was limited entirely to

its determination of whether or not there was direct evidence in the case and thereby determine whether or not the question of infliction of the death penalty should be submitted to the jury. Its province did not encompass the field of discussion of the evidence by its instruction to the jury.

. The record discloses that an employee of a newspaper was given the right to make examinations of certain . parts of the evidence for private purposes, but defendant was denied this right after making proper application therefor.

The district attorney, in his opening statement, told the jury that defendant's wife went to police headquarters, and he then said, "I cannot tell you what she told them, because that was hearsay." The inference was that she made some damaging statement, and this is only a part of the various matters that so electrified the already charged atmosphere to the end that defendant did not have a fair and impartial trial. If we emphatically disapproved such antics, such would not constantly be appearing in these cases. The district attorney well knew that defendant's wife could not be called as a witness to testify against him. All of this was climaxed by a sentence of from eighty years imprisonment at hard labor to life imprisonment given by an "unbiased and unprejudiced judge." The conviction was of murder of the second degree, the statutory penalty for which is imprisonment in the penitentiary for a term of not less than ten years to life. With defendant's age fixed at thirty-two years, his life expectancy was 33.92 years. The statute provides for a minimum and a maximum sentence, the intent of the statute being that the minimum would be less than the expected life of defendant, because the maximum is life. In this instance the court allowed no minimum, because its minimum allowance was more than twice the life expectancy. Technically, it may be said that the sentence imposed was within the limitation of the statute and the evil

arising therefrom is not for our correction; however, I am compelled to say that, under all the circumstances of the case, this was unusual punishment, especially so when the prejudice of the trial judge was brought in question, and in face of some of the errors herein mentioned. It is another instance of where, in the criminal courts of our land, injustice is an occasional visitor.